EMPIRE LIFE INSURANCE COMPANY, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE SAN JUAN, SECCIÓN PRIMERA, recurrido.

*Número:* O-76-229    *Resuelto:* 15 de septiembre de 1976

*Pieras & Esteves,* abogados de la recurrente; la Registradora recurrida compareció por escrito.

EL JUEZ ASÓCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

La recurrente tenedora de un pagaré a la orden por $7,000,000.00 garantizado con primera hipoteca sobre un inmueble en la Avenida Ashford del Condado, San Juan, procedió a la ejecución de su crédito por la vía ordinaria que terminó en subasta y adjudicación de la referida finca a la acreedora por su licitación de $150,000.00. Por este precio se otorgó escritura de venta judicial que es la Núm. 5 de 12 de marzo de 1976 ante el notario Lic. Juan F. Esteves, quien unió a la

escritura un documento que titula "acta notarial", con su sola firma, en el cual dicho notario certifica que ha cancelado el pagaré "trazando una equis (X) sobre el mismo y poniendo la anotación 'cancelado', procediendo a unir el original a la referida escritura número cinco (5) [sobre venta judicial], para así formar parte del protocolo notarial . . . ." No hay constancia de haberse cancelado sello alguno de rentas internas. Coetáneamente la recurrente obtuvo un mandamiento expedido por la Secretaria del Tribunal Superior de San Juan, en que dicha funcionaria "ordena la cancelación" de gravámenes posteriores al crédito ejecutado de conformidad con el Art. 125 de la Ley Hipotecaria. No se identifican dichos gravámenes en la orden secretarial, que según el Registro de la Propiedad consisten de una hipoteca por $1,500,000 y dos por $500,000 cada una, para un total de $2,500,000. La acreedora ejecutante presentó esta documentación y complementarios en el Registro de la Propiedad acompañando comprobantes de rentas internas en pago de derechos de $276.00 por la venta judicial y $7.50 por cancelación de gravámenes posteriores. La Registradora le exigió derechos por $13,976.50 y $4,926.50 por la adjudicación y cancelación respectivamente y como rehusara la recurrente consignar la deficiencia de $18,619.00, devolvió los documentos sin practicar operación con notas fundadas en que la Registradora justifica la denegación en la apuntada insuficiencia de derechos de arancel y además en la invalidez del acta notarial sobre cancelación del pagaré a la orden y del mandamiento para cancelación de gravámenes posteriores. Ha recurrido la acreedora adjudicataria y antes de entrar en los méritos del recurso gubernativo hemos de dejar nota de la vaguedad e imprecisión de la documentación de este caso. La escritura de venta judicial en su parte expositiva consta de cinco párrafos contentivos de cuatro referencias a otros documentos en una hoja y media de papel notarial; la certificación o "acta" de cancelación del pagaré, también lacónica, consta de hoja y cuarto principal-

mente dedicada a referencias a otros títulos; y la "orden" de cancelación de gravámenes posteriores que firma una subsecretaria del Tribunal Superior quien no la entera de su faz de lo que estaba cancelando pues no se indica ni la naturaleza ni el importe de dichos gravámenes. En nuestro sistema registral el notario ejerce una previa calificación de la legalidad y suficiencia de los documentos que ha de presentar al Registro y debe esforzarse por alcanzar la mayor claridad y certeza en los mismos facilitando la labor del Registrador con algo más que una lista de referencias a otros papeles que impone una extenuante labor de búsqueda y coordinación. La notaría es faena de tiempo y paciente integración de todos los elementos documentales, que sufre en su calidad con la festinación y la atracción de los atrechos fáciles.

## I

Sostiene la recurrente, contrario a lo resuelto en *Balbás* v. *Registrador*, 45 D.P.R. 804 (1933), cuya revocación propone, que los derechos de arancel por inscripción de la escritura de venta judicial han de calcularse tomando como base el precio de $150,000 que figura en la escritura de venta judicial, y la Registradora insiste en computar derechos sobre la cantidad de $7,000,000, valor de la hipoteca ejecutada y del derecho de dominio transferido. En lo pertinente, dispone la vigente Ley de Arancel del Registro de la Propiedad, que es la Núm. 91 aprobada el 30 de mayo de 1970 (30 L.P.R.A. sec. 1767a) en su Art. 1:

"El arancel de los derechos que se han de pagar en lo sucesivo por las operaciones en el Registro de la Propiedad, en la forma que las secs. 1767a a 1767e de este título disponen, será el siguiente:

. . . . . . . .

*Número Dos:* Por la inscripción, anotación, cancelación, liberación, respecto a cada derecho en una finca, se pagarán los siguientes derechos:

(a) *Si la finca o derecho vale* mil (1,000) o menos, se pagará un (1) dólar.

(b) *Cuando el valor de la finca o derecho* exceda de mil (1,000) dólares se pagará un (1) dólar por cada mil dólares o fracción de mil dólares del valor nominal de la finca hasta un valor máximo de veinticinco mil dólares.

(c) *Cuando el valor de la finca o derecho* exceda de veinticinco mil dólares se pagarán veinticinco (25) dólares por los primeros veinticinco mil dólares y dos (2) dólares por cada mil dólares o fracción de mil dólares adicionales." (Bastardillas nuestras.)

Históricamente el criterio determinante de aplicación del arancel ha sido "el valor de la finca o derecho", expresión mantenida en el arancel Número Dos, *supra*, preservada de los anteriores estatutos regulatorios de esta materia, a saber: Ley de marzo 10, 1904, pág. 144; Ley Núm. 32 de noviembre 30, 1917, pág. 309; Ley Núm. 113 de mayo 6, 1941; Ley Núm. 101 de mayo 12, 1943; Ley Núm. 67 de junio 20, 1963. En 1929 resolvió este Tribunal, que es el valor de las fincas o derechos que se transmitan, y no el precio del remate, lo que ha de tomarse para calcular los derechos de inscripción. *Schlüter* v. *Registrador*, 39 D.P.R. 462 (1929). En 1933 volvió este Tribunal a descartar el precio de adjudicación en subasta por el valor del derecho ejecutado, o sea, el principal de la hipoteca, para fijar los derechos de inscripción. *Balbás* v. *Registrador*, supra. Esta norma responde al propósito que infiltra el arancel de aproximar en lo posible la base impositiva al valor real del derecho objeto de la operación registral. El arancel que hoy rige sigue el mismo patrón al proveer que en las donaciones y otras trasmisiones a título gratuito no se aceptará la valoración hecha por los contratantes, sino la que apruebe el Secretario de Hacienda; y cuando remite al Registrador, faltando en el título constancia del valor de cada finca o derecho, a la tasación oficial para el pago de contribución sobre la propiedad. (Normas Primera y Sexta, Art. 2, Ley Núm. 91 de 1970.)

No encontramos razón en la contención de la recurrente que propone reducir la base de cómputo del arancel a 2% del principal de la hipoteca, elemento representativo del verdadero valor del inmueble ejecutado que consiste en 3.22 cuerdas bordeadas por el Atlántico y la Laguna del Condado en el lado Norte de la Avenida Ashford del Condado, San Juan, solar sobre el que se ha edificado un hotel de turismo de 320 habitaciones, para entonces llamado "San Gerónimo", ni se cumple el principio de legalidad ajustando el cobro de derechos a la desproporción resultante de pagar $150,000 por lo que fue buena garantía de $7,000,000.00.

La operación del Registro de la Propiedad se confronta en la práctica con dos realidades: la realidad registral y la extraregistral. Cuando surge discrepancia entre estos campos tenemos un vivo indicio de que una ficción ha ganado o está en vías de ganar acceso al Registro. La facultad de calificación del Registrador debe usarse dentro de su ámbito funcional, para negar legitimación registral a actos y contratos artificiosos y para promover la fidelidad óptima en los libros del Registro que acerque su realidad a la externa. La instrucción del Art. 18 de la Ley Hipotecaria (30 L.P.R.A. sec. 43) para que el Registrador califique bajo su responsabilidad la legalidad de las escrituras en cuya virtud se solicite la inscripción, y la capacidad de los otorgantes por lo que resulte de las mismas escrituras, se lee y aplica en Puerto Rico como más claramente expresa la Ley Hipotecaria Española: calificarán los títulos presentados por lo que resulte de los mismos y de los asientos del Registro con ellos relacionados. La calificación se extiende a toda clase de documentos pertinentes para apreciar la procedencia del asiento, en una conjunción de todos los elementos del título presentado y contenido del Registro. Roca Sastre, *Derecho Hipotecario*, Sexta Ed. (1968), Tomo II, pág. 260; *Autoridad de Fuentes Fluviales* v. *Registrador*, 71 D.P.R. 847 (1950); *Berlingeri* v. *Registrador*, 96 D.P.R. 706 (1968).

Al examinar los títulos y constancias del Registro referente al inmueble rematado, la Registradora recurrida encontró que "el valor de la finca objeto de inscripción" no es $150,000 importe de licitación y adjudicación en subasta sino el mayor de $7,000,000 principal de la hipoteca ejecutada y siendo la calificación función de raciocinio correctamente concluyó que la cifra mayor es más representativa del valor envuelto en la operación de Registro y por tanto sujeto a arancel. No hay en los títulos calificados datos que hagan del presente un caso de excepción a la conocida práctica comercial de que el principal de la hipoteca es inferior al valor del inmueble afecto a la misma. Al así calificar la Registradora sólo cumplió el deseable objetivo de excluir la ficción y abrir el Registro a la realidad del verdadero valor del inmueble o derecho inscrito.

█ Al calificar un título para inscribir, el Registrador no tiene obligación de examinar todos los asientos del Registro, ni aun los referentes a la persona que trasmite o adquiere, pero puede hacerlo dentro de este último límite. Y si, casualmente o con intención, encuentra datos contradictorios que tal vez le conste que existen, sería absurdo admitir una inscripción a todas luces improcedente, con arreglo al contenido del mismo Registro. Morell y Terry, *Legislación Hipotecaria*, Tomo 2, Segunda Edición (1927), págs. 260–61.

[5] Al aplicar el arancel del Registro de la Propiedad, el Registrador, a tenor ([1]) del título y los asientos relacionados, puede descartar el valor aparente, convenientemente expresado en la escritura de venta judicial, por el valor real que satisface la razón y el entendimiento.

█ En la ejecución de hipoteca, a diferencia de acciones en cobro de obligaciones que no tienen esa garantía, el valor de la finca o derecho trasmitido en venta judicial (Arancel

---

([1]) "En base" es modismo en boga, de oscuro linaje oficinesco enajenado del buen decir propio del habla forense.

Número Dos, Ley Núm. 91 de mayo 30, 1970) es el valor del crédito hipotecario y no la oferta que obtuvo la buena pro en subasta. *Balbás,* supra. Así lo determinan no solo el texto de la citada Ley de Arancel, y la consistente interpretación judicial, sino la correlativa operación de cancelación de hipoteca que ha de practicarse de oficio a tenor del Art. 79 de la Ley Hipotecaria (30 L.P.R.A. sec. 153) [2] y de cuya total cancelación se beneficia el adquirente en subasta, especialmente cuando es persona distinta al acreedor. La escritura de constitución del crédito hipotecario es en este caso el "título" a que ha de atenerse el Registrador para aplicar el arancel a la venta judicial, en cumplimiento del Art. 63, inciso 6, Reglamento Hipotecario (30 L.P.R.A. sec. 921(6)) en cuanto ordena que para dar a conocer con exactitud las fincas y los derechos que sean objeto de las inscripciones, el Registrador expresará el valor de la finca o derecho en la misma forma que apareciese en el título. Esta solución que reitera los precedentes en *Balbás* y *Schlüter,* supra, es la más armónica con el contexto general de la vigente Ley de Arancel, Núm. 91 de 1970, pág. 254, que en su Art. 2, Norma Duodécima [3] ordena:

---

[2] Al Art. 79 de la Ley Hipotecaria se le adicionó un inciso 5° por Ley Núm. 18 de julio de 1936 que dice:

"5. Las inscripciones de hipoteca serán canceladas de oficio, cuando de sucesivas inscripciones de la finca resultase que el derecho inscrito fue ejecutado y vendida en pública subasta la finca o derecho real sobre que se constituyera la hipoteca, a favor del acreedor o de otra persona; o cuando de sucesivas inscripciones resultase que la finca o derecho real hipotecado fue transferido por cualquier título a favor del acreedor según el registro."

[3] No corresponde resolver ahora sobre la aplicación de esta Norma XII a ventas judiciales que para la recurrente representaría aumentar de $7,000,000 a $9,500,000 la base para cómputo de derechos arancelarios pues la finca ejecutada soporta gravámenes hipotecarios posteriores que montan a $2,500,000. El aumento todavía no sería oneroso para la recurrente que entre los créditos accesorios obtuvo sentencia por $700,000 para "costas, gastos y honorarios de abogado" (véase edicto de subasta) como suma líquida que fue pactada en el pagaré no sujeta a determinación judicial. Advertimos, sin embargo, que en las ventas judiciales hay un elemento de colapso económico que no está presente en las ventas voluntarias o con-

"En caso de enajenación, cesión o compraventa de fincas gravadas con hipotecas según el Registro de la Propiedad, de no constar del documento la inclusión de dichas hipotecas en el precio de venta, se tomará como base el precio de la enajenación, cesión o compraventa o la suma total de las hipotecas, lo que resulte mayor a los efectos de la cancelación de los correspondientes derechos de inscripción."

## II

El pagaré garantizado con la hipoteca objeto de ejecución era un documento negociable, trasmisible por endoso cuya cancelación se exige, bien en la propia escritura de venta judicial o en documento público aparte a tenor del párrafo 4° del Art. 82 de la Ley Hipotecaria (30 L.P.R.A. sec. 156) que ordena: "Las inscripciones hechas para responder de cantidades representadas por títulos al portador o trasmisibles por endoso, se cancelarán presentándose la escritura otorgada por los que hayan cobrado los créditos, en la cual debe constar haberse inutilizado en el acto de su otorgamiento, los títulos endosables o al portador." *Porras* v. *Registrador*, 59 D.P.R. 595, 597–98 (1941). En vez de seguir la clarísima [4]

---

vencionales, en las que se pacta con pleno conocimiento de todos los gravámenes los cuales entran en la graduación del precio, característica que levanta una pared de diferenciación entre las ventas forzosas y las acordadas.

[4] En *Porras* v. *Registrador,* supra, dijo este Tribunal:

"El lenguaje del estatuto es claro y no deja en nuestro ánimo duda alguna en cuanto a la corrección de la nota recurrida. Una vez inscrita en el registro una hipoteca constituída en garantía de un pagaré transmisible por endoso o al portador, el registrador puede cancelar la inscripción solamente cuando se cumplan los siguientes requisitos: (a) presentación de la escritura otorgada por la persona que ha cobrado el crédito, y (b) en la escritura deberá constar que en el acto de su otorgamiento se inutilizó el título endosable o al portador. El estatuto no establece distinción alguna entre el cobro del crédito por el acto voluntario de las partes y el cobro por la vía judicial. Y como donde la ley no distingue a nosotros nos está vedado distinguir, tenemos que llegar a la conclusión de que tanto en la escritura de cancelación otorgada por el acreedor a favor del deudor, al recibir de éste el importe del pagaré negociable, como en la escritura

disposición de Ley y de jurisprudencia, el recurrente se desvió en dos aspectos fundamentales: en lugar de escritura optó por un "acta" o apéndice a la de venta judicial en que el propio notario, sin la comparecencia de la acreedora que había cobrado el crédito, certifica haber cancelado la obligación, y como antes anotamos, sin indicio alguno de haberse satisfecho los derechos del arancel notarial.

El método de cancelación ordenado en el Art. 82 de la Ley Hipotecaria está dirigido a sacar de circulación en el comercio el pagaré transmisible, bien por entrega o endoso, en protección de terceras personas ajenas a la extinción de la garantía hipotecaria que le impartía valor de título asegurado. A tales fines el otorgamiento de escritura pública por el poseedor legal del título transmisible por endoso es requisito indispensable de legalidad. *Dominici* v. *Registrador*, 59 D.P.R. 764, 767 (1942). La confusión de derechos al advenir el acreedor dueño del inmueble hipotecado es una de las causas de extinción de la hipoteca (Art. 1146, Código Civil) mas cuando se da en aquéllas constituidas para garantir títulos endosables o al portador, la regla especial del Art. 32 4º citado que exige cancelación por escritura, (5) ha de cumplirse. La letra de dicha disposición excluye la cancelación "automática" provista en el párrafo 2º del mismo artículo para cuando el derecho inscrito quede extinguido por declaración de la Ley, o resulte así de la misma escritura inscrita.

---

de venta judicial o de adjudicación que otorga el márshal a favor del acreedor hipotecario en pago de la totalidad o de parte de su crédito, deberá hacerse constar que el título representativo de la obligación y garantizado por la hipoteca ha sido inutilizado. El propósito evidente del legislador ha sido el de proteger a todas aquellas personas a quienes pudiera serle endosado o entregado el pagaré después de haber sido satisfecho y cancelada la hipoteca que lo garantizaba."

(5) Reiteración de la regla general que exige, para que puedan ser inscritos los títulos en que se extingan derechos de hipoteca, su consignación en escritura pública, ejecutoria o documento auténtico expedido por autoridad judicial. Arts. 2, 2º, y 3, Ley Hipotecaria.

# III

Como se ha dicho, el inmueble ejecutado estaba afecto a otras tres hipotecas: una por $500,000 a favor de San Jerónimo Hotel Corp.; otra de $1,500,000 a favor de René Aponte Caratini y otra de $500,000 a favor de este último. En la sentencia de dispuso, con prematuridad lo siguiente:

"5.—Una vez comprobado por la Secretaria, que la subasta produjo una cantidad que no igualó o superó el importe del crédito hipotecario objeto de ejecución, y que se notificó por la parte demandante a los titulares de dichos gravámenes posteriores cuyos créditos o derechos resultan del Registro para que pudieran concurrir a la subasta si lo creyeran necesario, se ordena la cancelación de cualquier gravamen posterior a la hipoteca que se ejecutó, conforme a lo dispuesto en el Artículo 125 de la Ley Hipotecaria [y] del Artículo 172 del Reglamento para su ejecución, para lo cual expedirá el correspondiente mandamiento de cancelación dirigido al Registrador de la propiedad de cuya demarcación se trate."

La sentencia no especifica cuáles son esos gravámenes posteriores y delegó por anticipado en la Secretaria la comprobación de haberse notificado la subasta a los acreedores titulares de los mismos.

En su párrafo 2°, el Art. 125([6]) de la Ley Hipotecaria (30 L.P.R.A. sec. 221) dispone:

"En los casos de que sobre una o varias fincas graviten créditos hipotecarios de varios acreedores y lleguen a venderse o adjudicarse para el pago al primer acreedor, en términos de

---

([6]) "Si se sigue el procedimiento ordinario o común para el cobro de un crédito hipotecario, la ley de 9 de marzo de 1905 relativa a las sentencias y la manera de satisfacerlas, nada dispone con relación a los segundos y posteriores acreedores hipotecarios, pero su silencio no puede autorizar que sin haber tenido ellos noticia previa de la subasta se dé cumplimiento respecto de los mismos, al artículo 125 de la Ley Hipotecaria. Están interesados en la subasta por tener un derecho real sobre la finca que se va a enajenar, y convenirles que se obtenga el mayor precio en la venta. La noticia previa es indispensable para que la cancelación se lleve a efecto mediante debido procedimiento de ley." *Montes de Oca* v. *Báez*, 23 D.P.R. 707, 711 (1916).

que el valor de lo vendido o adjudicado o no iguale o no supere al crédito hipotecario que se realice, los créditos restantes se entenderán de hecho y de derecho cancelados. Y se cancelarán en el registro, previa presentación ·del oportuno mandamiento judicial en que consten la venta o la adjudicación y sus causas, con expresión del acto que constituya la solvencia ·del crédito preferido, todas las inscripciones posteriores de censos e hipotecas y las anotaciones de embargo hechas también ·con posterioridad, dejando libres de todo gravamen por estos conceptos la finca o fincas enajenadas o adjudicadas."

■ El *mandamiento judicial* de cancelación que exige la ley no puede originarlo el Secretario. [7] Ha de estar precedido de una orden del juez dictada una vez satisfecho de haberse cumplido el requisito de notificación de subasta y con conocimiento de la naturaleza de los créditos posteriores a cancelarse. [8] No es éste un simple trámite de papeles,

---

[7] El mandamiento para cancelación de gravámenes posteriores, sin hacer referencia alguna a orden o providencia judicial que lo autorice, dice en lo pertinente:

"POR CUANTO: Habiéndose celebrado la subasta y apareciendo del Acta de la misma, librado por el Alguacil de este Tribunal con fecha de 12 de marzo de 1976, que la misma produjo una cantidad que no igualó o superó, el importe del crédito hipotecario objeto de ejecución y que se notificó por la parte demandante a los titulares de los gravámenes posteriores cuyos créditos y derechos resultan del Registro para que pudieran concurrir a la subasta si lo creyeran necesario;

"POR TANTO, se ordena la cancelación de cualquier gravamen posterior a la hipoteca que se ejecutó, conforme a lo dispuesto en el Artículo 125 de la Ley Hipotecaria, conforme a derecho.

"Y PARA QUE ASÍ CONSTE, expido el presente Mandamiento bajo mi firma y sello del Tribunal, en San Juan, Puerto Rico, hoy día 25 de marzo de 1976.

(FDO.) Belén Bonit

(FDO.) Por P. Santiago
Sub-Secretaria."

Contrario a lo que expresa, el acta de subasta nada dice respecto a la notificación del remate a los titulares de gravámenes posteriores.

[8] Entre los gravámenes posteriores puede haber hipotecas legales inscritas que por mandato del Art. 164 de la Ley Hipotecaria (30 L.P.R.A. sec. 288) "subsistirán hasta que se extingan los derechos para cuya seguridad se hubiesen constituido." *Cf. Buxó* v. *Alvarez & Zavala, Inc.*, 104 D.P.R. 678 (1976).

sino actuación que demanda el uso de criterios legales reservado al juez de derecho. El juez, no el secretario, es el guardador del debido proceso de ley. *Cf. Montes de Oca* v. *Baéz*, 23 D.P.R. 707, 711, *in fine*, 712; y Arts. 2, 2º y 3, Ley Hipotecaria. Es correcta la posición de la Registradora recurrida así expresada: "El juez no podía ordenar la cancelación de los gravámenes posteriores *antes de haberse celebrado la subasta.* Dependiendo la cancelación de los gravámenes posteriores de dos cosas que, necesariamente, tenían que haber ocurrido antes de la subasta (notificación a los titulares de los gravámenes posteriores) o en el acto de la subasta (que la subasta produjera una cantidad que no superara al crédito objeto de ejecución), es enteramente claro que, en el orden natural y lógico de las cosas, la cancelación de los gravámenes posteriores no podía solicitarse, ni debía ordenarse, en ningún momento antes de que tuviera efecto la subasta que es cuando únicamente el Juez podía tener ante sí los hechos o elementos que necesariamente tenía que considerar para resolver la cuestión."

## IV

█ La cancelación de los gravámenes posteriores devenga derechos de arancel. Al disponer el Art. 125, párr. 2º de la Ley Hipotecaria que "los créditos restantes se entenderán de hecho y de derecho cancelados, y se cancelarán en el registro, previa presentación del oportuno mandamiento judicial. . . ." no se dice que la cancelación se hará *de oficio*, término utilizado en el Art. 79, inciso 5º (30 L.P.R.A. sec. 153) con expresa limitación a la cancelación del crédito ejecutado.

*Las notas denegatorias de inscripción han de ser confirmadas.*

El Juez Asociado Señor Martín no intervino.