SUCN. DE CARMEN SANTOS VDA. DE OSORIO, ETC., ET AL., recurrentes, *v.* EL REGISTRADOR DE LA PROPIEDAD DE SAN JUAN, SECCIÓN VII, recurrido.

*Número:* O-79-126      *Resuelto:* 27 de junio de 1979

*W. R. Picorelli Osorio,* abogado de los recurrentes; la Registradora recurrida compareció por escrito.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La controversia sobre la validez, fragmentada o total, y la accesibilidad registral de la escritura pública ante nos exige "el más fino análisis de[l] documento, a fin de decantar, en cuanto a su contenido ideológico o expresivo, la graduada eficacia de cada una de sus menciones." Rodríguez Adrados, *Formación del instrumento público, validez, eficacia y libre circulación del negocio jurídico así documentado, incluso en las relaciones de Derecho Internacional Privado,* 97–98 Rev. Der. Not. 256 (1977).

Para cumplir satisfactoriamente esta tarea es menester,

a manera de recordatorio, que expongamos brevemente varios principios subyacentes que apuntalan el derecho notarial y registral.

Primeramente, en su acepción genérica, todo documento está formado, estructuralmente, por dos elementos: la *materia*—de carácter tangible o corporal—y su *contenido*, expresión del pensamiento de una persona o personas que se incorpora al primer elemento a través de la grafía escrita. En la teoría de los documentos públicos los instrumentos en que interviene un notario proyectan y forman dos planos horizontales y paralelos, a saber, el concerniente a su contenido sustantivo o acto documentado (*negotium*) y el referente al plano de *Instrumentum*, esto es, derecho notarial o forma, en sus importantes distinciones de los aspectos de "dimensión-acto" y "dimensión-papel" que destaca Nuñez Lagos. *Los esquemas conceptuales del instrumento público*, Rev. Der. Not., Núms. I y II (1953). La dimensión-papel no implica la física relativa al tamaño del papel empleado, sino a un resultado de visibilidad protocolaria, "por virtud de la narración, la imagen que refleja el negocio jurídico; o lo que es igual, se trata de expresar en el espacio, y mejor dicho en la extensión superficial, del papel, todos los elementos endógenos y exógenos que integran la formación y configuración del acto jurídico." Neri, *Tratado de Derecho Notarial*, (1970), Tomo 3, págs. 320–321.

Segundo, "[e]l notario es un profesional de derecho que ejerce una función pública para robustecer, *con una presunción de verdad*, los actos en que interviene, para colaborar en la formación correcta del negocio jurídico y para solemnizar y dar forma legal a los negocios jurídicos privados. . . ." Giménez Arnau, *Introducción al Derecho Notarial*, (1944), pág. 44.

La autenticidad y validez del instrumento público es el resultado neto del notario acatar fiel e integralmente los requisitos de la ley notarial referentes a comparecencia, exposición, estipulaciones, otorgamiento y autorización.

"Ante este autor, [el notario] auténticamente establecido por el documento mismo, tiene lugar el hecho que motiva su otorgamiento, al que se reconducen, en unidad de acto, una serie de hechos (presencias, lugar, capacidad natural, libertad física, actos de exhibición, de ofrecimiento y entrega, declaraciones en su realidad fáctica, lectura, firmas, etcétera) que, percibidos directamente por el Notario, quedan también cubiertos por la fe pública." Rodríguez Adrados, *op. cit.*, pág. 259.

En el acto notarial el fedatario percibe directamente y certifica los hechos susceptibles de ser absorbidos por los sentidos, y en virtud de unas exigencias y formalidades de la ley se les confiere ". . . una serie de presunciones *juris tantum* particulares, de veracidad o de legalidad, que acaban integrando una presunción general de verdad y de legalidad del mismo instrumento, *considerado como un todo." Id.* pág. 263.

Y tercero, en orden a la garantía de verdad que ofrece la intervención notarial en la negociación privada para el Registro de la Propiedad—donde la corrección, exactitud y verdad son corolarios y objetivos imprescindibles para su buen funcionamiento—la escritura pública representa la principal fuente de acceso que sirve de refuerzo al llamado principio de legalidad. Tenemos la responsabilidad de evitar la inscripción de títulos nulos. *Royal Bank of Canada* v. *Registrador,* 104 D.P.R. 400, 404–405 (1975); Roca Sastre, *Derecho Hipotecario,* (1968), Tomo II, pág. 561; Martínez Irizarry, *El principio de inscripción y el principio de legitimación en P.R.,* 38 Rev. Jur. U.P.R. 193–210 (1969).

I

Con estas nociones elementales en mente, examinemos los hechos ante nos.

En *Sucn. Osorio* v. *Osorio,* 102 D.P.R. 249 (1974), decretamos la nulidad de la escritura Núm. 155 otorgada ante el notario Luis Sánchez Vahamonde el 4 de noviembre de 1923, en la cual Antonio Osorio Santos y los

hijos de sus hermanas fallecidas Francisca y Consuelo, vendieron a los hermanos Josefa y Martín Osorio Santos, las cuotas indivisas hereditarias que poseían en cierto inmueble dejado por su madre Carmen Santos Vda. de Osorio Santos. Este dictamen se produjo al haber los hijos de Antonio impugnado exitosamente la validez de dicha escritura demostrando cumplida y cabalmente que su causante Antonio era un analfabeto que no sabía ni podía firmar, razón por la cual era apócrifa la firma que de su nombre aparecía al pie del referido instrumento. En consecuencia expresamos: "La presunción de validez de los actos notariales es una de carácter rebatible y en este caso fue rebatida por la prueba de los recurridos." (Pág. 254.)

En el recurso gubernativo ante nos los miembros de la Sucn. de Carmen Santos Vda. de Osorio sostienen que es incorrecta la negativa del Registrador en inscribir la referida escritura. Argumentan, que aunque nula en cuanto a la transacción y participación de Antonio, es título válido inscribible que recoge las compraventas de las restantes cuotas. Aducen que, "ya anteriormente se ha resuelto que el contrato contenido en una escritura pública es válido aunque ésta adolezca de algún defecto", invocando *Reyes* v. *Torres*, 65 D.P.R. 821 (1946); *Rosario* v. *Registrador*, 59 D.P.R. 428 (1941) y *Clavell* v. *Clavell*, 41 D.P.R. 195 (1930).

## II

El señalamiento, según veremos, es improcedente pues confunde el ámbito del negocio jurídico y la forma notarial que encierra toda escritura, y el alcance de la "teoría de conversión" consagrada en el Art. 1177 del Código Civil, 31 L.P.R.A. sec. 3273. Malavet Vega, *Notas sobre el Derecho Notarial*, (1968) pág. 208. Además, tal posición implica la aplicación errónea de importantes postulados y principios relativos a la fe notarial. Veamos.

La Sec. 20 de la Ley Notarial, dispone:

"Serán nulos los instrumentos públicos:

1.     .     .     .     .     .     .     .
2.     .     .     .     .     .     .     .
3. En que no aparezcan las firmas de las partes cuando deben hacerlo. . . ."

■ Este precepto informa las circunstancias que vician de nulidad formal radical total una escritura. Se trata de infracciones a la gestión notarial que no pueden convalidarse. La firma es un requisito esencial del instrumento por estimarse que ello conlleva una aprobación del texto escrito que antecede. Si la omisión de la firma invalida el otorgamiento, no se necesita mucho esfuerzo para entender el impacto que conlleva la falsificación de una firma en el instrumento. El mecanismo para lograr correspondencia real y legítima entre persona y firma, es exigiendo la ley la comparecencia y conocimiento por el notario. En otras palabras, la fe de conocimiento persigue evitar la suplantación de las partes en el otorgamiento.

"Nuñez Lagos luego de calificar de momento cumbre de una escritura el llamado por la legislación notarial *otorgamiento* dice es 'la prestación solemne del consentimiento al texto recién leído por entero, consentimiento que se proyecta sobre toda la extensión del documento, sobre su tenor literal'. . . . *En realidad el 'otorgamiento' y la 'autorización' son dos elementos tan estrechamente unidos que será muy difícil poderlos separar.* Por ello al otorgamiento y autorización concurren los otorgantes para prestar su asentimiento; los testigos instrumentales, si los hay, para enterarse del acto o contrato celebrado y poder, en cualquier tiempo, robustecer con su testimonio la fe del Notario; y éste para firmar, rubricar y signar el instrumento, dando fe de todo lo contenido en él." González López, *Manual de Práctica Notarial*, (1978), pág. 102. (Énfasis nuestro.)

Según reseñáramos previamente, en el caso ante nos el notario autorizante consolidó en una sola escritura tres negocios distintos y en unidad de acto: (a) certificó la comparecencia de tres vendedores, dos compradores y dos testigos instrumentales; (b) dio fe de que los conocía a todos; y (c) atestó el otorgamiento de las partes y testigos y

suscripción de sus correspondientes firmas. Sin embargo, la prueba en el caso de *Osorio*, supra, estableció indubitadamente que la firma de Antonio era espúrea. No se trata pues, como aduce el recurrente, de una simple falta de firma en uno de los negocios separados, sino de la simulación de la signatura de uno de los comparecientes principales.

No albergamos duda de que uno u otro caso—ausencia o simulación—el problema no tendría mayor trascendencia si las partes que concurrieron a esa escritura hubieran consignado sus transacciones en diversos instrumentos, pues por razón de distintas escrituras, cualquier vicio o fraude que maculara el negocio de uno de ellos, así como cualquier error en la forma del título, en nada hubiese afectado o anulado los restantes negocios o títulos. Sin embargo, ese no es el caso ante nos, en el cual un título defectuoso—una sola escritura—recoge tres transacciones (negocios). Aunque exista pluralidad en los negocios, instrumentalmente, en su dimensión papel, la escritura constituye un todo o unidad. Reconocemos que no hay prohibición, notarial o legal, que de ordinario impida que una misma escritura contenga negocios diversos, relacionados o no. Sin embargo, es evidente que la nulidad interna o formal del documento no puede separarse para sostener su validez fraccionada, en situaciones como las de autos, en que la falsificación de una firma destruye en toda su extensión la presunción de verdad que regularmente ampara al instrumento.

Sobre el particular, a riesgo de ser repetitivos, es menester tener presente la importante distinción referente a la validez del negocio jurídico como tal—compraventa, arrendamiento, por ejemplo—frente a la validez del instrumento público donde se recoge formalmente dicho negocio: la escritura. Como señala Castán, el defecto de forma, es decir el defecto escriturario, no priva al contexto, al negocio en sí, de su efectividad—*Derecho Civil*

*Español, Común y Foral,* Tomo 3, pág. 482 (1974)—pues como atestigua Scaevola, del Art. 1230 del Código Civil, 31 L.P.R.A. sec. 3451, se desprende que las condiciones esenciales para su validez no se encuentran en la forma. Scaevola, Q. M., *Código Civil* (1958), XX, pág. 1077. Contrastando esta nota de "informalidad" en las obligaciones y contratos, advertimos que son otros los principios que apuntalan el acceso al Registro. Para esa función, aunque no haya duda alguna sobre la efectividad y validez del negocio entre las partes, se requiere indispensablemente un título pulcro, esto es, una escritura válida que lo recoja: al Registro "solo tiene acceso registral los títulos perfectos." Roca Sastre, *op. cit.,* pág. 239 *et seq.* En consecuencia, aun bajo el supuesto de validez de las otras transacciones, debemos requerir que la escritura en donde éstas se agruparon sea válida.

## III

Cuando el notario o las partes, por las razones que estimaren a bien, optan otorgar diversos negocios en una sola escritura, se plantean varias interrogantes sobre las distintas fases, etapas y aspectos que en sus dimensiones conlleva el instrumento público. A tal efecto, analicemos algunos de los aspectos presentes en este caso.

Como ya señaláramos, un título, para ser eficaz, ha de contener la firma de los otorgantes, y en caso de pluralidad de negocios y otorgantes, surgen complicaciones. Al respecto opinan Galindo y Escosura:

"Si al otorgarse una escritura a favor de varias personas, concurren todas éstas, y se hace constar así en la cabeza del instrumento, y luego, por cualquier causa, sólo firman algunas, entendemos que no será inscribible en cuanto a éstas, y que en ese caso el Notario, desde el momento en que advierta la ausencia de algunos contrayentes, debe suspender la redacción de la escritura; porque siendo la firma requisito indispensable para la validez, ha de tenerse por nula la que aparece otorgada por personas cuya firma no se estampa al final.

Si la escritura fuere de venta de varias fincas de un dueño otorgada a favor de distintas personas singularmente, y los compradores de unas fincas se hubieran retirado y no firmasen aquélla, y los de otras persistiesen y firmaren, nos inclinamos a que, respecto a éstos, sería inscribible, porque siendo contratos diversos e independientes, y la unión de los compradores, no en la cosa, sino sólo en la materialidad de la escritura, completamente voluntaria, en nada perjudicaba la nulidad de unas ventas a la validez de las otras." *Comentarios a la Legislación Hipotecaria de España*, (1903), Tomo 2do, págs. 41-42.

■ A tenor con este enfoque, es clara la regla que propone que la falta de la firma de uno de los comparecientes vicia de nulidad el instrumento al punto de que no se ostentarán tampoco título inscribible aquellos que firmaron. Se atempera la norma según los mencionados juristas, cuando tratándose de negocios separados la falta de la firma obedece al voluntario retiro de uno de los contratantes.

■ Distinta situación se suscita ante nos. En la escritura que examinamos, no se trata de retiro alguno de otorgantes o falta menor, si que por mor de un artificio— que denota engaño y quizás dolo—se consigna en la escritura que alguien que no podía firmar estampó su firma ante el notario. Ello conlleva, a juicio nuestro, otra suerte. "La escritura es un conjunto orgánico y, en lo que toca a su esencia misma, está integrada por elementos que se conexionan entre sí." Neri, *op. cit.*, pág. 559. La fe notarial que de una u otra manera imprime el notario en una escritura no puede fraccionarse ni segmentarse en estadios y referirla a unas partes y a otras no. En el caso de autos el notario, quien certificó conocer personalmente a los otorgantes, atestiguó que firmaba ante él quien no podía hacerlo, todo ello a ciencia y paciencia de los que con él allí estaban. En la trama de falsificación de la firma del otorgante Antonio, es lógico razonar que intervinieron sus hermanos y sobrinos allí presentes. Es posible concluir que tal vez el notario no conociera al otorgante—y fuera

inducido a engaño—pero es difícil imaginar lo contrario por parte de sus hermanos y sobrinos. Ciertamente éstos no podían sostener posición tan frágil, aduciendo falta de conocimiento. Y siendo cándidos, si éstos alegadamente no presenciaron la firma del que impersonó a Antonio, entonces podría aducirse que el notario violó el requisito de *unidad de acto* que debió observar por haber permitido la presencia y participación de testigos instrumentales. Sec. 27, Ley Notarial, 4 L.P.R.A. sec. 1025; *Reyes* v. *Torres*, supra. Bajo ambas alternativas, la nulidad de la escritura es incuestionable, total y absoluta.

■ Más aún, habiendo el fedatario utilizado la fórmula tradicional de que todos los que firmaron comparecieron—implicando con ello unidad de acto, esto es, simultaneidad en asunto, lugar, tiempo y personas—la cuestión resultaría de mayor gravedad y "con una consecuencia terrible—escribió Nuñez Lagos—la falta de unidad de acto instrumental no es causa de nulidad; *es de falsedad. Para no incurrir en ella, a hechos y momentos de otorgamientos diversos, textos documentales diferentes."* Rodríguez Adrados, *op. cit.*, 246 (Énfasis nuestro.)

Con razón advierte Neri, "la verdad es que la dación de fe de la identidad personal es de esencia de todo acto jurídico, y por tanto, parte intrínseca del instrumento público; de manera, entonces, que atento a los términos definitorios del precepto apuntado, la escritura pública que carezca de este requisito estará viciada de nulidad." *Op. cit.*, págs. 451-452.

■ En conclusión, en la escritura Núm. 155, el notario al dar fe de que firmaba una persona a quien él no conocía, o que quizás conociendo no correspondía con quien aparecía físicamente frente a él, hirió de muerte la validez total del instrumento público que otorgaba. Las siguientes razones la hacen nula: falta de dación de fe e inobservancia del requisito de "unidad de acto", como consecuencia de la falsificación de la firma de Antonio,

con la participación activa o pasiva de sus hermanos y sobrinos. Las observancias y exigencias notariales que instrumentalmente debe revestir y conferirle categoría a la escritura están conjugadas entre sí, independientemente de la separabilidad, como negocios, de las compraventas.

## IV

No estamos ante un caso de firma omitida, sino simulada. La fe notarial fue destruida. "[S]i la ley hace de la dación de fe una de las mejores virtudes jurídicas y, a tal fin, la impone como requisito esencial; si en armonía con esta norma básica estima el notario como 'juez del conocimiento' de los otorgantes; si el escribano es árbitro de su propia intervención; si su afirmación es un fallo de verdad de la escritura, el más elemental de los juicios instiga a la convicción de que una escritura viciada de esa falta perjudica la seguridad de los derechos en juego, precisamente porque la omisión de un extremo legal tan explícito le quita todo el auspicio que trasunta la afirmación notarial. . .se trata de la preterición de un requisito que le quita al instrumento y a su contenido, todo sentido de verdad." Neri, *op. cit.*, págs. 451–452.

A error induce la cita de don José Ma. Manresa en que descansa la posición minoritaria. Se refiere la misma al Art. 1223 del Código Civil Español, que equivalente al 1177 nuestro, dispone:

"La escritura defectuosa por incompetencia del notario o por otra falta en la forma, tendrá el concepto de documento privado si estuviere firmado por los otorgantes."

El precepto recoge la denominada "teoría de conversión", mediante la cual—si están presentes los requisitos de consentimiento, objeto y causa—*inter partes*, el negocio puede existir, pero frente a terceros y a los fines del Registro de la Propiedad, el negocio sólo tendrá valor si reviste la exteriorización requerida de escritura. Es en

virtud de la autorización y fe notarial, que el negocio sale de la esfera privada y se convierte en instrumento público.

Con el trasfondo legal antes expuesto es fácil advertir que cuando el ilustre maestro expresa que la ". . . escritura defectuosa hará prueba contra quienes la firmaron", quiere decir que hará prueba *como documento privado*, y huelga repetir, que tales escrituras quedan al margen, por lo general, del ámbito registral. *Comentarios al Código Civil*, (1967), Tomo 8, Vol. II, págs. 98–99.

## V

Carece de mérito la objeción constitucional que *sua sponte* se levanta en la opinión minoritaria. Aunque ciertamente los recurrentes no fueron parte en el pleito que motivó nuestra decisión en *Sucn. Osorio*, supra, ese hecho no milita contra la función calificadora del Registrador, que como corolario del axioma registral de legalidad, se impone en toda competencia ante él. Mojica Sandoz, *El Registrador y el Principio de Legalidad*, 32 Rev. C. Abo. P.R. 277–290 (1971). "La facultad de calificación del Registrador debe usarse dentro de su ámbito funcional, para negar legitimación registral a actos y contratos artificiosos y para proveer la fidelidad óptima en los libros del Registro que acerque su realidad a la extrema." *Empire Life Ins. Co.* v. *Registrador*, 105 D.P.R. 136, 141 (1976). Contra el resultado de la calificación tienen las partes el recurso gubernativo dispuesto en la ley en el cual se consignan las alegaciones pertinentes. Ello satisface el debido proceso de ley, máxime ante la comparecencia en este foro de todos los miembros de la sucesión de *Carmen Santos Vda. de Osorio*, tal y como surge del epígrafe del recurso.

Los recurrentes pretenden conseguir la inscripción al margen de lo resuelto en *Sucn. Osorio*. Acuden al Registro con el mismo título que allí declaramos nulo y nada persuasivo alegan para respaldar la validez formal

del instrumento. Tienen a su favor el remedio incorporado en el Art. 1231 del Código Civil, 31 L.P.R.A. sec. 3452, en el sentido de que pueden compeler a los vendedores a otorgar una escritura. Manresa, *op. cit.*, pág. 98. No obstante, aducen que ello representa litigio y gastos. Aun así, tales dificultades ". . . no justifican degradar la fe pública y el valor de legitimación que tan pesadamente descansan en esa dación de fe de conocimiento de las personas y de haberse el notario asegurado de su identidad." *In re Cancio Sifre*, 106 D.P.R. 386 (1977).

Conviene concluir citando al insigne notario madrileño don Rafael Nuñez Lagos: "la falsedad es la noche oscura del documento público; pero la falsedad es al documento público lo que la noche al fuego; brilla más y se destaca mejor." La integridad de la fe notarial no nos permite suscribir, mediante el desdoblamiento de una escritura en que ha mediado un decreto de nulidad por falsificación en uno de sus negocios, su validez.

*Careciendo los restantes negocios del revestimiento instrumental necesario, no podemos atribuirle sanción oficial notarial ni registral alguna, y por ende, se dictará sentencia confirmándose la nota de la Registradora.*

El Juez Asociado Señor Díaz Cruz emitió opinión disidente a la cual se unen los Jueces Asociados Señores Rigau y Dávila.

—O—

Opinión disidente emitida por el Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau y Dávila.

San Juan, Puerto Rico, a 27 de junio de 1979

Por escritura Núm. 155, otorgada en Río Grande el 4 de noviembre de 1923 ante el notario Luis Sánchez Vahamonde, Antonio Osorio Santos y los herederos de sus hermanas Francisca y Consuelo Osorio Santos, vendieron a

los hermanos Josefa y Martín de los mismos apellidos sus condominios hereditarios proindivisos en finca rústica de 14.35 cuerdas en el barrio Medianía Alta del término municipal de Loíza, que hubieron al suceder a la causante común de vendedores y compradores Carmen Santos Vda. de Osorio. Dicha finca estaba afecta a hipoteca por $500 a favor de Marcial Suárez quien en 1937 ejecutó su crédito y obtuvo se le adjudicara en subasta. Una vez dueño de la finca, dicho acreedor la vendió a los compradores nombrados al principio, Josefa y Martín Osorio. Años más tarde los herederos de Antonio Osorio impugnaron con éxito dicha venta judicial y reivindicaron la participación de una quinta parte ($1/5$) de su causante en la referida finca al determinar el tribunal la nulidad de lo actuado por haberse recurrido por el acreedor demandante al emplazamiento por edicto de dichos sucesores de Antonio, cuando por ser su lugar de residencia conocido debió habérseles notificado la demanda personalmente. La parte perdidosa recurrió a este Tribunal Supremo y al confirmar la sentencia en *Sucn. Osorio* v. *Osorio*, 102 D.P.R. 249 (1974), decretamos la nulidad de la escritura anterior Núm. 155 de 1923 por resultar de la evidencia elevada con el recurso que Antonio Osorio Santos era analfabeto y nunca firmó la dicha escritura.

Presentada al Registro de la Propiedad en 1978 la citada escritura Núm. 155 de venta de condominios, el 5 de marzo de 1979, denegó su inscripción la Registradora de la Propiedad basada en el dictamen de nulidad de *Sucn. Osorio* v. *Osorio*, supra.

La inscripción procede. La sentencia en la acción reivindicatoria promovida por los herederos de *Antonio* Osorio Santos se circunscribe al condominio de una quinta parte por éste vendido, pero no afecta las ventas en el mismo documento realizadas por los herederos de *Francisca* y *Consuelo* Osorio Santos, que nunca han sido cuestionadas. Toda vez que la nulidad de escritura es parcial y limitada

en sus efectos y consecuencias, subsisten en su integridad jurídica los traspasos hechos por los sucesores de dichas Francisca y Consuelo. *Cf. Rosario* v. *Registrador,* infra; *Morales* v. *Cabrera,* 53 D.P.R. 94, 103 (1938).

La escritura, llamada también documento o instrumento público, es el ropaje que reviste el acto o contrato de la legitimidad dimanante de la fe pública notarial y le imparte admisibilidad como prueba. Así se desprende del Art. 1172, 31 L.P.R.A. sec. 3273, al declarar:

"Los documentos públicos hacen prueba, aun contra tercero, del hecho que motiva su otorgamiento y de la fecha de éste. También harán prueba contra los contratantes y sus causahabientes, en cuanto a las declaraciones que en ellos hubiesen hecho los primeros."(1)

La nulidad de una escritura puede fundarse en defecto de forma a que se refiere el Art. 20 de la Ley Notarial(2) que dice:

"Serán nulos los instrumentos públicos:

1.     .    .    .    .    .    .    .
2.     .    .    .    .    .    .    .
3. En que no aparezcan las firmas de las partes, cuando deben hacerlo, la firma del notario, y, en los casos previstos por las secs. 1014, 1016 y 1027 de este título, las firmas de los testigos." (Ley Núm. 99 de 27 junio, 1956, 4 L.P.R.A. sec. 1020.)

Se llama también nulidad de escritura, aunque desviándonos de la calificación precisa, a la que tiene raíz en la invalidez o inexistencia del *contrato* contenido en el documento público. En tal caso si la escritura comprendiera más de un contrato, su nulidad estará ceñida estrictamente al impugnado, sin que se afecte la validez de las restantes obligaciones sustantivas creadas por los otorgantes y favorecidas

---

(1) La escritura pública es admisible en evidencia como prueba de que las partes en ella celebraron el *contrato contenido en la misma. Gómez* v. *Am. Col. Bank,* 34 D.P.R. 148, 151 (1925).

(2) El Art. 1171 del Código Civil dispone que los documentos en que intervenga notario público se regirán por la legislación notarial.

por la fe notarial. Esta es conclusión inevitable cuando, como en el presente caso, la venta a Josefa y Martín Osorio por los herederos de sus hermanas Francisca y Consuelo no fue cuestionada, no fue objeto de adjudicación ni determinación alguna por el Tribunal, y dichos vendedores jamás fueron citados ni oídos en el pleito que dio lugar al decreto de nulidad parcial. Nuestro *per curiam* en *Sucn. Osorio* en nada puede afectar las compraventas separadas de condominios que no pertenecían al analfabeto Antonio, máxime cuando dichos dos negocios jurídicos no fueron objeto ni causa de litigio ante el tribunal de instancia. La situación es distinta a la de *Rosario* v. *Registrador*, 59 D.P.R. 428, 431–432 (1941), en cuya decisión sostuvimos que la falta de firma (huellas digitales) de la compradora es motivo de nulidad de escritura declarado en el Art. 20(3) de la Ley Notarial, *supra*, que priva a dicho documento de la calidad de título inscribible según el Art. 3 de la Ley Hipotecaria.([3]) En *Rosario*, supra, la escritura comprendía un solo contrato de compraventa, un solo título traslativo del dominio de un inmueble; aquí la escritura Núm. 155 citada contiene tres títulos traslativos inconfundibles en su identidad propia e independiente, en dos de los cuales para nada se necesitó ni cuenta la firma de Antonio Osorio que dio lugar a la nulidad. "Mientras de falsedad no se le impugne, el documento notarial subsiste en la esfera de la verdad y legitima para el tráfico lo convenido, dentro de la legalidad, bajo la garantía de la fe pública."([4])

Las ventas de los condominios hereditarios de Antonio, Francisca y Consuelo Osorio Santos son obligaciones independientes entre sí, enteramente separables una de la otra. De haberse formalizado en tres escrituras separadas, nadie insinuaría su nulidad porque había resultado falsa la firma

---

([3]) Art. 3—"Para que puedan ser inscritos los títulos expresados en la sección anterior, deberán estar consignados en escritura pública, ejecutoria o documento auténtico, expedido por Autoridad judicial, o por el Gobierno o sus agentes en la forma que prescriban los reglamentos." (30 L.P.R.A. sec. 3.)

([4]) Bonet Ramón, *Código Civil Comentado*, 2da ed. (1964), pág. 920.

de Antonio en la otra escritura. La escritura notarial como la ejecutoria judicial o sentencia y el estatuto legislativo, no es monolito[5] que sucumbe en la totalidad de su sola pieza por vicio que dañe alguna de sus partes. Los títulos traslativos de las participaciones de Francisca y Consuelo tienen su propia integridad jurídica tanto en substancia como en forma, y no sufren la nulidad por contagio.

Manresa[6] destaca la subsistencia de contratos no impugnados y la correlativa validez de la escritura que los contiene al dictaminar que "La ley [Art. 1223, Código Civil español— Art. 1177, Código Civil de Puerto Rico] habla de que la escritura tenga las firmas de los otorgantes, pero no dice de *todos éstos*, y de ahí que entendamos nosotros que las firmas cuya necesidad establece este artículo para tener aplicación, deben ser las de aquellos cuya concurrencia al otorgamiento de la escritura exigiera la obligación para su validez, y habrá de determinarse por tanto, según la naturaleza de ésta y el número de personas a quienes afecte. . . . Si suponemos un acto al que concurran varios deudores en vez de uno solo, y la escritura aparece firmada por algunos mas no todos, será necesaria una distinción. Si las obligaciones son independientes entre sí, la escritura defectuosa hará prueba contra quienes la firmaron." (Énfasis en el original).

Galindo y Escosura también sostienen el principio de sobrevivencia de contratos válidos en la escritura afectada de nulidad en otros extremos ajenos a los mismos, y determinando que por tratarse de contratos diversos e independientes, la unión de los otorgantes "solo en la materialidad de la

---

[5] El mismo principio de divisibilidad deja subsistente la sentencia ganada en acción ordinaria sobre ejecución de hipoteca en perjuicio de los herederos del deudor que se hallaban debidamente ante el tribunal, aun cuando se anule en cuanto a herederos menores de edad que no fueron emplazados. *Morales* v. *Cabrera,* 53 D.P.R. 94, 103 (1938).

La persona no parte en un pleito sin nexo jurídico (*privity*) con los litigantes, no viene obligada por la sentencia. *Carreras* v. *Brunet,* 47 D.P.R. 443 (1934); *Quintana Reyes* v. *La Capital de P.R.,* 52 D.P.R. 358 (1937).

[6] *Comentarios al Código Civil Español,* 6ta. ed., (1967), Tomo 8, Vol. II, págs. 98–99.

escritura" nada resta a su calidad de título *inscribible.* Exponen los ilustres tratadistas:([7]) "Si la escritura fuere de venta de varias fincas de un dueño, otorgada a favor de distintas personas singularmente, y los compradores de unas fincas se hubieran retirado y no firmasen aquélla, y los de otras persistiesen y firmaren, nos inclinamos a que, respecto a éstos, *sería inscribible,* porque siendo contratos diversos e independientes, y la unión de los compradores, no en la cosa, sino sólo en la materialidad de la escritura, completamente voluntaria, en nada perjudicaba la nulidad de unas ventas a la validez de las otras." (Énfasis nuestro).

Por la ineludible función de este Tribunal como principal guardador del debido proceso de ley, su iniciativa en revisión decretando la nulidad de la escritura Núm. 155 de 1923 al determinarse la falsedad de la firma del vendedor Antonio sólo puede entenderse como limitada a la venta que dependió de dicha firma apócrifa, y en modo alguno puede la declaración de nulidad extender su sombra a las ventas legítimamente realizadas por los herederos de *Francisca* y *Consuelo* Osorio Santos, cuyas firmas y voluntad de enajenar no han sido jamás cuestionadas, y especialmente no lo fueron en el citado caso de *Sucn. Osorio* v. *Osorio,* por lo que sus determinaciones no obligan a sus compradores *Josefa* y *Martín,* y en consideración, además, a que sus vendedores (herederos de Francisca y Consuelo) no fueron parte en dicha acción civil. De no entenderse así limitada y cualificada, nuestra decisión en *Sucn. Osorio* v. *Osorio,* supra, estaría herida de nulidad por contravenir el debido proceso de ley. *Rodríguez* v. *Albizu,* 76 D.P.R. 631, 638 (1954);([8]) *Carrero Suárez* v. *Sánchez López,* 103 D.P.R. 77, 82 (1974).

---

([7]) Galindo y Escosura, *Comentarios a la Legislación Hipotecaria de España,* 4ta. ed. (1903), Tomo 2, pág. 42.

([8]) "El verdadero ataque contra la validez de la sentencia se basa en que [la persona] no tuvo su día en corte.... Convenimos en que una sentencia dictada contra una parte sin ser ésta oída, o sin habérsele dado una oportunidad de ser oída, no es una determinación judicial de sus derechos y en su consecuencia no merece ser

La nulidad parcial provocada por falta de la firma de Antonio Osorio Santos en nada afecta el aspecto formal del título presentado al Registro, que constituye el medio adecuado para el acceso a éste de los títulos inscribibles de los recurrentes. Intacta la vestidura formal de este negocio jurídico, que es la escritura, está franca la entrada al Registro de la mutación jurídico-real inmobiliaria que sobrevivió nuestra citada sentencia. Roca Sastre, *Derecho Hipotecario*, 6ta. ed. (1968), Tomo 2, pág. 558 y ss.

Revocaría la nota de la Registradora y ordenaría la inscripción de la finca a favor de los herederos de Josefa, Martín y Antonio Osorio Santos.

respetada por ningún otro tribunal (Cita de *Freeman on Judgments*). Una sentencia así dictada violaría el principio constitucional del debido procedimiento de ley."