*In re* RAÚL M. OLMO OLMO, querellado.

*Número:* O-80-97    *Resuelto:* 25 de octubre de 1982

*Héctor A. Colón Cruz, Procurador General, y Rosa Negrón, Procuradora General Auxiliar,* abogados de El Pueblo; *Harry Anduze Montaño,* abogado del querellado.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 9 de abril de 1981, por vía de reconsideración, dejamos sin efecto la opinión Per Curiam y sentencia del 6 de marzo de 1981 mediante la cual se separa por dos (2) años del notariado al Lic. Raúl M. Olmo Olmo. Ordenamos se dilucidara de manera plenaria el siguiente cargo formulado en su contra por el Procurador General:

El abogado Raúl M. Olmo Olmo, actuando como notario público incurrió en conducta ilegal, e impropia, al autorizar la escritura Número 5 de Poder Especial, el día 11 de septiembre de 1976, supuestamente otorgada por Víctor M. Rodríguez Alamo, y dar fe de conocer personalmente a dicho otorgante y de que éste había suscrito ante él dicho documento, cuando real y efectivamente el querellado no tuvo ante sí ni vio firmar al otorgante, no conocía a Víctor M. Rodríguez Alamo y la firma de este último, en efecto era falsificada.

I

Previo los trámites de rigor, el Comisionado Ramón Pérez De Jesús rindió su informe formulando las siguientes conclusiones de hecho:

■ El querellado Raúl M. Olmo Olmo es un abogado en la práctica activa de la profesión en Puerto Rico desde el año 1970. Actualmente está en la práctica privada. Antes trabajó con la Sociedad de Asistencia Legal de Puerto Rico como abogado generalista, abogado de apelaciones y Jefe de Oficina. Practica la notaría conjuntamente con la abogacía. Es una persona joven y jefe de familia. Se enfrenta por primera vez a un proceso disciplinario.

■ El día 11 de septiembre de 1976, actuando como notario, el querellado autorizó la escritura de Poder Especial número 5. El poderdante o compareciente en este documento se identificó como Víctor M. Rodríguez Álamo, esposo de Doña Migdalia Rodríguez Rodríguez, mayor de edad y vecino de Caguas, Puerto Rico. El indicado Víctor M. Rodríguez Álamo, quien como señalaremos en detalles más adelante, resultó ser un farsante y asistió a la oficina del querellado acompañado de su alegada esposa, Migdalia Rodríguez Ro-

dríguez, y de un tal Rojas, empleado de una compañía financiadora conocida como Island Homes Sales, Inc., ubicada en la Avenida Muñoz Rivera de Río Piedras, Puerto Rico.

■ Migdalia Rodríguez y Víctor M. Rodríguez Álamo —el verdadero— vivieron juntos como marido y mujer, sin haber contraído matrimonio, por alrededor de doce años y tuvieron cinco hijos. En el año 1976 se separaron y Víctor se fue a Estados Unidos por algún tiempo. Viviendo juntos, habían adquirido una casa con solar propio en el Proyecto de Viviendas VBC-Tres radicado en el Barrio Cagüitas de Caguas. Este proyecto, auspiciado por la Corporación de Renovación Urbana y Vivienda, era conocido como Urbanización Delgado. La propiedad fue comprada a nombre de ambos.

■ Mediante la referida escritura de Poder Especial número 5, otorgada ante el querellado, el compareciente —el supuesto Víctor M. Rodríguez Álamo— dió poder legal a su alegada esposa, Migdalia Rodríguez Rodríguez, autorizándola a realizar determinadas transacciones en relación con los bienes pertenecientes a la sociedad constituída por ambos. La autoridad conferida incluía, entre otras facultades, vender, comprar, hipotecar propiedad, tomar dinero a préstamo y otorgar todos los documentos legales que fueren necesarios para llevar a cabo todo lo relacionado con el poder. En la parte de comparecencia de la citada escritura número 5 el querellado, actuando como notario, dió fe del conocimiento personal del compareciente, Víctor M. Rodríguez Álamo y, por los dichos de éste, de su edad, estado, profesión y vecindad. El auténtico Víctor M. Rodríguez Álamo estaba en desconocimiento de estos actos fraudulentos.

■ Al otorgarse la citada escritura número cinco que motivó la querella en el presente caso, el apócrifo compareciente que dijo llamarse Víctor M. Rodríguez Álamo, compareció ante el querellado acompañado de Migdalia Rodríguez y de la otra persona ya identificada como "Rojas" quien, como ha quedado dicho, era empleado o funcionario de Island Homes Sales, Inc. Por la prueba presentada, puede inferirse que el querellado conocía a esta persona de apellido *Rojas* aunque no sus maquinaciones fraudulentas. Anteriormente, Migdalia había visitado al querellado en la oficina de éste, a instancias de Rojas, para orientarse respecto al otorgamiento del poder. *El querellado no conocía al verdadero*

*Víctor M. Rodríguez Álamo ni a la persona que compareció* *como otorgante suplantando al primero. Tampoco estaba cons-* *ciente de que estaba participando en una transacción fraudu-* *lenta. Antes del acto del otorgamiento de la escritura el quere-* *llado tuvo una corta conversación con el compareciente respecto* *a su trabajo y su familia, y tuvo, además, ante sí la licencia de* *conducir vehículos de motor expedida a nombre de Víctor M.* *Rodríguez Álamo.* El Comisionado Especial acepta esta ver-sión de los hechos frente a la versión ofrecida por Migdalia al efecto de que los documentos que presentó el compareciente "Nacho" fueron las tarjetas del seguro social federal y del servicio selectivo, fundamentado en la naturaleza y calidad de ambos testimonios. El verdadero Víctor M. Rodríguez Álamo exhibió en la silla testifical una licencia de conducir vehículos de motor con los bordes de la cubierta de plástico despegados haciendo muy fácil sacar y substituir la fotografía que es parte de la misma. La naturaleza y calidad del testimonio de Migdalia serán evaluados más adelante.

■ Utilizando el poder antes consignado, Migdalia Ro-dríguez vendió la casa que se menciona en el hecho "TER-CERO", anterior, perteneciente a ella y al verdadero Víctor M. Rodríguez Álamo. De igual manera, después de pagar la deuda que gravaba la casa, ella utilizó el remanente del dinero para uso propio, todo sin conocimiento ni consenti-miento de su marido consensual. La venta de la referida pro-piedad se llevó a cabo con la intervención de terceras perso-nas, entre ellas, el ya mencionado Sr. Rojas y el comprador Jaime Colón Encarnación. Todos tenían conocimiento del fraude que se estaba consumando, el cual se inició con el otorgamiento del poder especial ante el querellado. También incurrió en representación falsa en el otorgamiento de la escritura de compraventa, otorgada ante el notario José R. Lázaro Paoli y en la que la compareciente como esposa del comprador no era tal esposa, sino una tercera persona.

■ Transcurrieron alrededor de dos años y, como resultado de la querella presentada por el verdadero Víctor M. Ro-dríguez Álamo, se denunció el hecho, ahora constatado, de que la persona que compareció ante el querellado el día 11 de septiembre de 1976 y otorgó la escritura de poder número cinco era un falsificador que, mediante una trama urdida por

el Sr. Rojas y Migdalia Rodríguez, suplantó al auténtico Víctor M. Rodríguez Álamo.

■ Migdalia Rodríguez es una mujer que fue convicta por el delito de hurto mayor el día 6 de octubre de 1975 y sentenciada a sufrir una pena de 1 a 3 años de presidio, sentencia que le fue suspendida y la convicta puesta en libertad a prueba. El delito cometido consistió de apoderarse de un número de marbetes de vehículos de motor correspondientes al año fiscal 1972-73 y pertenecientes al Departamento de Transportación y Obras Públicas de Puerto Rico. Además, el día 26 de junio de 1979 fue convicta por el delito de apropiación ilegal agravada y sentenciada a sufrir una pena de 7 a 10 años de presidio, reducida, más adelante, a otra de 3 a 6 años. Esta convicción fue motivada por los hechos fraudulentos y apropiación de fondos que produjeron las transacciones relacionadas con la casa que ella poseía en común con su marido consensual Víctor M. Rodríguez, transacciones que se iniciaron con el otorgamiento del poder fraudulento ante el querellado y, en el que la propia Migdalia desempeñó papel principal. Este historial, unido a la forma y contenido del testimonio de Migdalia Rodríguez en la vista ante el Comisionado Especial en el curso del cual admitió haber mentido y engañado en todos los trámites que resultaron en la venta fraudulenta de la propiedad, mueven a no dar crédito a las partes substanciales de su testimonio. Migdalia se encuentra actualmente en libertad bajo palabra mientras cumple su segunda sentencia por delito que conlleva depravación moral. Por otro lado, el propio Víctor M. Rodríguez fue convicto en el año 1979 por el delito de tentativa de asesinato y sentenciado a una pena de 1 a 3 años de presidio, en probatoria. En el caso civil número 79-319 del Tribunal Superior, Sala de Caguas, Víctor M. Rodríguez demanda a Migdalia Rodríguez y otros, solicitando la nulidad de la venta de la propiedad y demás transacciones siguientes.

■ Migdalia Rodríguez, el personaje conocido por "Nacho", Jaime Colón Encarnación —comprador de la casa— y el funcionario de la Island Homes Sales, Inc., sobre cuya identidad precisa no se presentó prueba, fueron los personajes de cuya trama de falsa representación e impostura resultaron víctimas Víctor M. Rodríguez y el propio querellado.

■ El querellado admite que fue engañado e inducido a error en el proceso de identificación del otorgante en la escritura de poder especial otorgada ante él el día 11 de septiembre de 1976. Alega no obstante, que actuó con diligencia al identificar al compareciente de acuerdo con la práctica de la profesión notarial, según reconocida por el Tribunal Supremo de Puerto Rico *In Re Cancio Sifre*, 106 D.P.R. 386. A estos efectos y como parte de la prueba de reputación, presentó los testimonios del Honorable Luis Mojica Sandoz, actual Director de la Sección 1 de Caguas del Registro de la Propiedad, y del Honorable Ángel G. Hermida Nadal, Juez Superior. Los testimonios de estos testigos que no fueron cuestionados en forma alguna por la parte querellante ni resultaron increíbles, confirmaron la posición asumida por el querellado. Es necesario señalar aquí, también, que en el curso de la Conferencia Preliminar las partes estipularon que la práctica prevaleciente en Puerto Rico para la identificación de los comparecientes es que el notario no está restringido en sus medios para identificar otorgantes al uso de testigos de identificación y se utilizan los variados recursos que su profesión de abogado le provee para asegurarse de tal identidad. Aparte de la identificación del otorgante, no existe controversia sobre el hecho de que el querellado *no consignó en la escritura de poder el documento que utilizó como parte de dicha identificación.*

■ La prueba de reputación presentada por el querellado, incontrovertida, dejó establecido que éste goza de una reputación personal y profesional excelente, tanto en la comunidad como entre sus compañeros y los tribunales, *reputación que se estima incompatible con conducta fraudulenta de su parte en la práctica de la profesión notarial.*

■ En fin, el Comisionado Especial concluye, como cuestión de hecho, que si bien el querellado no actuó con la acuciosidad que debería exigirse de un notario al tratar con otorgantes desconocidos, su conducta revela, más bien, inadvertencia y un error de juicio al entender que la forma en que él actuó cuando identificó al otorgante de la escritura número 5 del 11 de septiembre de 1976 estaba de acuerdo con la Ley Notarial y la práctica reconocida por la profesión legal y del Tribunal Supremo de Puerto Rico. Debe reconocerse, sin embargo, que corresponde al Honorable Tribunal Supremo

no a este Comisionado determinar, como cuestión de derecho, cuál debe ser la práctica permisible como complemento a las disposiciones legales expresamente estatuídas. *In re Cancio Sifre*, supra, establece claramente la norma respecto a la autorización de documentos públicos cuando el notario es parte de una corporación de la cual tiene control económico y esta corporación comparezca ante él como parte otorgante. En cuanto a la suplantación de parte, el Tribunal determinó en dicho caso que el notario fue víctima de personas inescrupulosas y no impuso medida disciplinaria alguna en consideración, además, a que el notario actuó sin pérdida de tiempo para corregir las consecuencias de su inadvertencia. En ninguna parte de este caso se encuentra aprobación judicial a la práctica irregular de identificación y fe de conocimiento por parte del notario Cancio Sifre. El caso del querellado Olmo Olmo se diferencia de *In re Cancio Sifre*, además de lo referente a reparación de las consecuencias, en lo referente a la forma en que ambos casos fueron traídos a la consideración del Tribunal. *In re Cancio Sifre* fue traído a manera de sentencia declaratoria y el del querellado Olmo Olmo en forma de querella presentada por el Procurador General siguiendo orden del propio Tribunal. Estas diferencias son, sin embargo, de naturaleza procesal, no substantiva y, por estar limitado a hacer únicamente determinaciones de hecho, el Comisionado Especial se abstiene de hacer pronunciamiento alguno en cuanto a si las señaladas diferencias entre uno y otro caso justifican medidas disciplinarias distintas. Esa es función reservada al Honorable Tribunal. El Comisionado Especial hace claro que ha entrado en la discusión del caso *In re Cancio Sifre* por la importancia que el querellado ha dado a los hechos del mismo a través de todo el proceso de su propio caso. (Énfasis suplido.)

## II

La fiel y justa decisión jurídica en el ámbito disciplinario exige una breve exposición de los orígenes y dinámica conceptual del requisito de la fe de conocimiento.

*Sinopsis histórica*

Las constancias más precisas sitúan su origen en la Escuela de Bolonia, durante el siglo XIII. A. Ventoso

Escribano, *La fe de conocimiento, antecedentes y estado actual de la cuestión en el Derecho español,* 96 Rev. Der. Notarial, Núm. 337, 340 (Abril–Junio 1977). España lo incorpora claramente en el Fuero Real (Libro I, Tít. VIII, Ley I) al preceptuar, "Cómo el Escribano debe conocer a los que ante él otorgaren alguna cosa. Ningún Escribano público no faga carta entre ningunos homes, menos de los conoscer, e de saber sus nombres, si fueren de la tierra; e si no fueren de la tierra, los testigos sean de la tierra, e homes conocidos. . .".

Otros antecedentes son el Espéculo (Ley VI, Tít. XII, Libro IV), Las Partidas (Ley 54, Tít. 18, Partida 3ra), y La Pragmática de Alcalá (Pragmática del 7 de junio de 1503, Cap. 2°) (Ley 2, Tít. 23, Libro X de la Novísima Recopilación). En la Nueva Recopilación se expresa el principio en el siguiente tenor: "Que cuando el escribano NO CONOSCIERE A LAS PARTES haga la diligencia en esta Ley contenida. Otrosí mandamos que si, por ventura, el tal escribano NO CONOSCIERE A ALGUNA DE LAS PARTES, que quisiere otorgar el tal contrato o escritura, que no lo haga ni resciba; SALVO si las dichas partes que así no conosciere presenten dos testigos que digan que los conoscen; i que hagan mención dello a fin de la tal escritura, nombrando los testigos i assentando sus nombres i donde son vecinos; i si el Escribano conosciere al otorgante de fé en la suscripción que le conoce."

La doctrina se recoge en la Ley del Notariado español del 28 de mayo de 1862. La cuestión ha sido afectada, en esa jurisdicción, por otras leyes y reglamentaciones posteriores.

*Texto y jurisprudencia en Puerto Rico*

La Ley del Notariado español de 1862 ". . .constituye el remoto antecedente de la nueva legislación puertorriqueña, la cual pondrá de relieve sus conexiones con aquélla en muchos aspectos". E. Menéndez, *Lecciones de Derecho Notarial,* Equity Publishing Corp., 1967, Sec. 13 a la pág. 23. Ésta reguló la notaría en nuestro país hasta el cambio de

soberanía. Subsiguientemente se promulgó la ley de 31 de enero de 1901, según enmendada, la cual estuvo vigente hasta la ley del 8 de marzo de 1906. Ésta fue derogada por la ley vigente —Núm. 99 del 27 de junio de 1956, según enmendada. 4 L.P.R.A. sec. 1001 *et seq.*; P. Malavet Vega, *Notas sobre el Derecho notarial puertorriqueño*, Escuela de Derecho, Univ. Católica de P.R., 1968, pág. 19-21. La Sec. 16 del estatuto es el precepto básico que gobierna la solución del caso. Reza:

> *Los notarios darán fe en los instrumentos públicos de que conocen a las partes, o de que se han asegurado de su conocimiento por el dicho de testigos. También darán fe* acerca de la edad, estado, profesión y vecindad de los otorgantes, con relación al dicho de los mismos, y en caso de que fuera casada la persona que aparezca como adquirente del derecho que es objeto del contrato, se expresará el nombre y apellido del cónyuge que no comparezca al otorgamiento. *En casos graves y extraordinarios en que no sea posible consignar por completo estas circunstancias, expresarán cuanto sobre ellos les conste de propia ciencia y manifiesten los testigos. El testigo o testigos de conocimiento, deberán ser, en todo caso, personas bien conocidas del notario, y éste deberá dar fe de ello en el documento. En tales casos graves y extraordinarios que a un notario le sea imposible dar fe del conocimiento de los otorgantes, ni puedan éstos presentar un testigo o testigos de conocimiento, lo expresará así, designando los documentos que le presentaren como prueba de su nombre, estado y vecindad, y refiriendo además el motivo del caso grave o extraordinario.* (Énfasis suplido.) 4 L.P.R.A. sec. 1016.

En *In re Cancio Sifre*, 106 D.P.R. 386, 394–395 (1977), abordamos por primera vez en detalle el aspecto de la identificación notarial. Luego de referirnos a lo preceptuado en la transcrita sección y la consecuencia jurídica de anulabilidad por su inobservancia en los instrumentos públicos, dijimos:

> [L]a identificación de los otorgantes no pertenece a lo formal del documento, que deba exigírsele al Notario, ni siquiera al mundo de lo jurídico, sino al del exterior que aquél no puede

captar ni por su vista, ni por su oído, ni por sus sentidos. Siendo el otorgante, únicamente, quien sabe si dice o no la verdad, al declarar ser determinada persona, es él quien únicamente puede aportar los medios para su identificación; está fuera de la función y de las posibilidades del Notario como tal y como individuo. Escobar de la Riva, *Tratado de Derecho Notarial*, página 384 (1957). El problema lo es sólo en apariencia inducida por la retórica. *La Ley no exige el conocimiento "personal" de otorgantes por el notario en el concepto de una relación previa a su llegada a la notaría. Basta el conocimiento que el notario deriva de su observación de los otorgantes identificándose mutuamente en las etapas preliminares del acto jurídico notarial*, toda vez que, con rarísimas excepciones en que dos partes se ponen de acuerdo para defraudar, los otorgantes tienen tanto interés como el notario en la trasmisión de un título válido, y debe suponerse que en los contratos bilaterales el que contrata con una persona obligándose a su favor y estipulando derechos, le conoce perfectamente. *El notario no está restringido en sus medios para identificar otorgantes al uso de testigos de identificación. Su profesión de abogado le provee variados recursos para asegurarse de tal identidad*. . . .

La transformación de nuestra economía, el incremento poblacional concentrado en grandes ciudades sin duda *hacen más laboriosa para el notario la identificación de otorgantes, pero no justifican degradar la fe pública y el valor de legitimación que tan pesadamente descansan en esa dación de fe de conocimiento de las personas y de haberse el notario asegurado de su identidad.* Temprano en el Derecho notarial afloró el mandato: "e debe ser muy acucioso el Escribano de trabajarse de conocer los omes a quien faze las cartas, quién son y de qué lugar, de manera que non pueda ser fecho ningún engaño." (Ley 68, título 18, Partida 3ra) *La garantía que para el tráfico jurídico y legitimación de actos representa el citado requisito del Art. 16 de la Ley bien vale que el notario sea acucioso y esforzado en revelar la identidad de quienes ante él contratan o actúan.* (Énfasis suplido.)

█ Subsiguientemente, en *Sucn. Santos v. Registrador*, 108 D.P.R. 831, 837 (1979), indicamos que el "mecanismo para lograr correspondencia real y legítima entre persona y

firma, es exigiendo la ley la comparecencia y conocimiento por el notario. *En otras palabras, la fe de conocimiento persigue evitar la suplantación de las partes en el otorgamiento".* (Énfasis suplido.)

*Significado del concepto*

██ Ante todo es esencial dejar sentado que la "afirmación de la identidad de los otorgantes es llamada en el lenguaje notarial *fe de [c]onocimiento".* H. García García, *Introducción a la técnica de la redacción de instrumentos públicos,* 1-2 Rev. Der. Notarial 257, 273 (Julio–Diciembre 1953). Pero el concepto trasciende su literalidad. En el ámbito notarial, "[l]a idea de compareciente va inexorablemente unida al hecho material de la presencia física ante notario". R. Núñez Lago, *Los esquemas conceptuales del instrumento público,* 1-2 Rev. Der. Notarial 49, 78 (Julio–Diciembre 1953). Esa comparecencia, como hecho físico y coetáneo al otorgamiento, implica su narración en la forma documental (instrumento) mediante la dación de fe de conocimiento de identidad.

El reputado notario argentino Omar A. Lassaga al descomponer el significado de fe de conocimiento en sus variadas proyecciones expone con insuperable claridad:

Etimológicamente, *fe* proviene del latín *fides,* y analógicamente, del griego *peitheim, peithomai* (convencer, persuadir); griegos y latinos emplearon dichos vocablos significando: conformidad a un hecho, confianza en el dicho o hecho de otro.

Jurídicamente, *fe* es la creencia que se da a las cosas por la autoridad del que las dice, esto es, en cuanto al significado amplio y sin retaceos que se le asigna al vocablo en el aspecto legal.

El *conocimiento* es sinónimo de entendimiento, ciencia, sabiduría, razón natural y congénita del hombre para inquirir, por medio de sus facultades mentales y creadoras: la constitución, razón de ser, cualidades generales, especiales y relaciones de las cosas que los rodean y constituyen el gran todo de su vida anímica: física, moral o intelectual.

Existe en la palabra *conocimiento* una íntima raigambre humana, ya que la misma está condicionada a las nobles facultades del *yo*, facultades que encontraron su más fiel, fecundo y primogénito intérprete en Sócrates . . . bástenos hacer breve referencia de dónde provienen los vocablos *fe* y *conocimiento* cuyos significados etimológico y filosófico hemos enunciado, y, en cuanto al jurídico, lo haremos conocer para completar el concepto.

Al hablar de *fe* nos referimos a la humana exclusivamente o a la que deriva de razones humanas, sean éstas: privada o pública, "la primera como creencia de lo que nos dicen los demás hombres y la segunda, como creencia de lo que no vimos ni oímos, apoyada en el testimonio del poder central".

Por *conocimiento* entendemos —haciendo abstracción de toda otra argumentación— la certidumbre que tenga el Notario de la identidad de las personas de los otorgantes, que son los que al concurrir al acto lo hacen para crear, modificar o extinguir alguna relación jurídica.

Interpretamos por *fe pública*, como la define el distinguido Notario y Abogado Dr. José María Mengual y Mengual, "el asentimiento que con carácter de verdad y certeza prestamos a lo manifestado por aquellos a quienes el poder público reviste de autoridad asignándoles una función".

En consecuencia, la fe del conocimiento es un atributo de la fe pública, con quien tiene íntimas relaciones propias de su misma razón de dependencia: género y especie; en efecto, la fe pública es lo primero, en virtud del carácter amplio de su significado, alcances y aplicación, que puede aludir a los diversos poderes del Estado, y lo segundo, fe del conocimiento, que se circunscribe y es propia de un funcionario: el Escribano.

Con los conceptos enunciados, por nuestra parte, creemos estar en condiciones de emitir una definición de lo que entendemos por Fe de conocimiento *como la atestación que el Escribano hace de que el o los otorgantes del acto jurídico o relación contractual, son en su esencia los mismos que se afirman en su identidad personal, y no otros.* O. Lassaga, *El Documento Notarial — La Fe de Conocimiento — El Juicio de Capacidad de los Otorgantes,* Segundo Congreso Interna-

cional del Notariado Latino en Madrid, octubre de 1950, T. III, págs. 205–207.

## Trascendencia del requisito

■ Es casi unánime la posición que adjudica a la fe del conocimiento una importancia suprema e imperiosa en la gestión notarial. Giménez Arnau considera que el fundamento racional de la identificación del requirente estriba en "la finalidad del instrumento público y en su eficacia. Todo el contenido de la escritura, si no se acredita la identidad del compareciente puede resultar estéril, porque sus efectos deberían quedar subordinados a la prueba de que las personas designadas en la comparecencia eran efectivamente las que habían de concurrir al otorgamiento". E. Giménez Arnau, *Instituciones de Derecho Notarial*, Madrid, Ed. Reus, 1954, T. II, pág. 42. José M. Sanahuja y Soler en su *Tratado de Derecho Notarial* (Barcelona, Ed. Bosch, 1945, T. I, pág. 457) estima que "en principio es necesario que el notario garantice la identidad de las personas que intervienen en un negocio jurídico, porque la ilación entre unas situaciones y otras exige, para dar certidumbre a las relaciones jurídicas, que se fundamente bajo la fe notarial el punto de unión o de conexión, que es precisamente la persona que ostentando un derecho lo transmite a favor de otra". En igual sentido, consúltese Pedro Ávila Álvarez, *Estudios de Derecho Notarial*, 4ta ed., Madrid, Ed. Montecorvo, 1973, Sec. 15, pág. 121. M. Fernández Casado, en su *Tratado de Notaría* (Madrid, 1895, T. I, pág. 463) describe elocuentemente que la fe de conocimiento "es la rueda catalina de la autenticidad; sin él nunca podría alejarse el temor de una suposición ó usurpación del estado civil. De poco serviría que el Notario recogiera cuidadosamente las manifestaciones de los concurrentes á su estudio y las revistiera de todas las solemnidades del instrumento público, si no constara que la persona que establecía la relación jurídica era la misma á quien verdaderamente corresponden el nombre y apellidos con que se presenta á contratar".

■ Otro corolario al respecto es la íntima relación y vínculo lógico que existe entre el conocimiento —directo o indirecto— de los comparecientes y la *calificación de capacidad*. Giménez Arnau destaca que "donde no haya fe de conocimiento la fe de capacidad sirve para muy poco". *Op. cit.*, pág. 43. Núñez Lago coincide que sin "esta calificación del Notario —que supone una previa inquisición— el tráfico jurídico se vendría abajo". R. Núñez Lago, *Estudios sobre el Valor Jurídico del Documento Notarial*, Talleres Penitenciarios Alcalá de Henares, 1945, pág. 91. Concurriendo con este enfoque están José A. Negri, *La Fe de Conocimiento*, Segundo Congreso Internacional del Notariado Latino, 1950, T. III, pág. 365; Omar A. Lassaga, *op. cit.*, pág. 206; Chico Ortiz y Ramírez Ramírez, *Temas de Derecho Notarial y Calificación Registral del Instrumento Público*, Madrid, 1972, pág. 78. Como lo resume López Garzón, "[c]omo se ve, con dist[i]ntas palabras todos atribuyen a la fe de conocimiento esta importante misión: asegurar que el compareciente *es* quien *dice* ser". *Titularidad y Fe de Conocimiento*, 7 Rev. Der. Notarial 269, 270 (Enero–Marzo de 1955).

## Dificultades Prácticas

Como en otras áreas del derecho, la formulación de la norma resulta más fácil que aplicarla a la práctica. Así, la dificultad en la fe de conocimiento se ha expuesto desde posturas ilógicas hasta las más razonables. Principios elementales dimanantes de las limitaciones propias del ser viviente, la colisión que su observancia absoluta a extremos absurdos implicaría, ha movido a los estudiosos de la materia a reconocer sus parámetros. Giménez Arnau expresa cómo fue necesario ". . . *humanizar* su cumplimiento, descargando al Notario de las graves responsabilidades que pudieran derivarse de dar por conocida a la persona a la que realmente conoce, aunque sea bajo una falsa identidad, con el mismo grado de conocimiento (notoriedad) que el común de las gentes relacionadas social y profesionalmente con la persona de cuya verdadera identidad se trate". *Op.*

*cit.*, pág. 43. Ello ha producido durante toda época abundante literatura que recoge tres corrientes; a saber: (1) la *clásica* —"da a la fe de conocimiento trascendencia y calificativo de solemnidad esencial inflexible y dura"; (2) la *ecléctica* —que "concilia el rigorismo clásico con las necesidades del momento"; y (3) la *heterodoxa* —que propugna "la eliminación de la fe del conocimiento y acepta como suficiente garantía el dicho de las personas que declaran ser tales como se nombra". Lassaga, *op. cit.*, págs. 208–210.

Al presente, la visión más admitida en los sectores del notariado hispano-latino es la ecléctica. Ventoso Escribano indica:

[E]ste requisito no se puede concebir como *un conocimiento absoluto de la persona ya que si así fuera se exigiría del Notario algo que es prácticamente imposible.* A este respecto la doctrina es muy gráfica, así dice Núñez Lagos "para que el Notario tuviera la evidencia, de visu, et auditu suis sensibus, de que el compareciente era la personalidad física y jurídica que se afirmaba, haría falta que como tal notario presenciara el hecho del parto y la identidad permanente del nacido desde el alumbramiento hasta la comparecencia"; también es expresiva la idea expuesta por González Palomino de que sólo se podría conseguir este conocimiento si cada uno de nosotros llevara una marca indeleble en alguna parte del cuerpo. Podemos terminar estos gráficos ejemplos con las siguientes palabras de Díez Pastor "De la identidad de un ser humano no puede estar, y eso dentro de ciertos límites objetivamente seguro, sino quien, habiendo asistido al nacimiento, lo haya tenido en su compañía sin interrupción sustancial. El propio interesado, que, si no es un anormal tiene, sin duda, la intuición primaria de su identidad psíquica y biológica, es decir, la de haber sido siempre el que es, para conocer su identidad jurídica se ha de confiar al testimonio de sus familiares o cuidadores, puesto que al establecerse la prueba de su estado carecía de razón."

Naturalmente estas frases son lo suficientemente expresivas como para echar por tierra la exigencia de la fe de conocimiento si éste fuera entendido de un modo absoluto. *Lo que sucede es que la doctrina aboga por un conocimiento rela-*

*tivo, por un convencimiento íntimo del Notario.* (Escolios omitidos y énfasis suplido.) *Op. cit.,* págs. 358–359.

Este mismo autor define la fe de conocimiento como la "expresión que el Notario hace en el documento del juicio de notoriedad de la identidad del compareciente de tal modo que la persona que en la comparecencia se ha dicho que tiene tales nombres y apellidos en la vida cotidiana es conocida por los mismos". Ventoso Escribano, *op. cit.,* pág. 368.

Lassaga, en su obra citada, reproduce el siguiente panorama de Germán Pérez Olivares y Gavira, ilustrativo de los conflictos:

"El mundo ha sufrido y sufre gigantescas convulsiones ante la quiebra de los ideales, crece la sed insaciable de la riqueza. Esta resaca no podía por menos que repercutir en las Notarías. Con las clásicas y seguras clientelas se mezclan elementos rodadizos, desdibujados, equívocos. Se trabaja a un ritmo vertiginoso, con una nerviosidad de alta tensión. Cada momento exige una extremada diligencia y un derroche de precauciones. La documentación identificatoria, en muchísimos casos, es deficiente o nula. Las suplantaciones de personas no podían hacerse esperar. Se derrumba el instrumento y se busca, como en todas las catástrofes, la víctima propiciatoria. En estos casos de fácil hallazgo: el Notario. Sobre la cabeza del desventurado funcionario, por el mero hecho de haber autorizado el instrumento, se polarizan toda clase de responsabilidades morales, procesales y económicas." Pág. 208.

Las serias responsabilidades que para el notario implica la dación de fe de conocimiento, plantea, en uno de sus extremos vitales, el problema respecto al *cuándo* del conocimiento, esto es, con relación al momento en que el notario puede lícitamente afirmar y decir que conoce a una persona. Se reconoce que el mandato legal y la expresión notarial en sí en el instrumento, afirmativa de que éste conocía a los otorgantes, conlleva e implica un conocimiento previo, aunque la doctrina acepta que no puede precisarse con rigurosidad matemática el tiempo o extensión que debe

preceder. Giménez Arnau, haciendo referencia a una cuestión aludida por De la Cámara, planteó que:

"[E]s discutible hasta qué punto la convicción del Notario ha de haber sido adquirida antes del otorgamiento de la escritura. En rigor, se puede sostener que sólo cabe dar fe de conocimiento cuando al Notario le consta de *ciencia propia*, y con *anterioridad* a la autorización del documento, *la notoriedad de la identidad. El hecho de que la Ley, al hablar de los testigos de conocimiento, disponga que han de conocer al Notario y a los comparecientes, presupone que el conocimiento directo por parte del Notario ha de ser previo.* Sin embargo, como no cabe puntualizar a través de reglas rígidas con que con anterioridad debe quedar establecido el conocimiento, y como, por otra parte, se trata de que el Notario forme su convicción sobre un hecho no susceptible de constatación directa, inmediata y sensorial, parece que puede ser suficiente que el compareciente le sea presentado por otra persona a quien conozca *y que le merezca absoluta confianza.* En tal caso puede afirmarse que el Notario ya conoce al interesado, sin perjuicio de la repercusión que este modo de formar su propia convicción pueda tener sobre su responsabilidad civil." E. Giménez Arnau, *Derecho Notarial*, 2da ed., Pamplona, Ediciones Universidad de Navarra, 1976, págs. 624–625.

*Medios de identificación de los otorgantes*
  (Directos y supletorios)

◼ La doctrina reconoce, como lo hace el texto transcrito de nuestra Ley Notarial, el medio *normal* o *directo* de la dación de fe de conocimiento a base de creencia propia del notario. ¿Qué conlleva esa afirmación? En el cumplimiento de la obligación notarial de cerciorarse de la individualidad de los sujetos otorgantes —identidad personal, hacerlo constar y dar fe de ello— "importa el estado de convicción a que llega el notario en cuanto a la identidad de los comparecientes, luego de examinar el conjunto de atributos y circunstancias que física y jurídicamente le asisten". A. Neri, *Tratado Teórico y Práctico de Derecho Notarial*, Buenos Aires, Ed. Depalma, 1970, Vol. 3, pág. 418.

Su mecánica o actividad funcional, esto es, ". . .en lo que atañe a la 'calificación' que le asiste al notario de identificar a las partes, Núñez Lagos ha dicho que esta fase no importa un hecho *in rerum natura* sino *un juicio* del notario impuesto por la necesidad que existe de conexionar 'el hecho de la exhibición o comparecencia actual de la parte con el nombre y personalidad de titular que ostenta la misma. No es tampoco una afirmación de carácter absoluto, pues para que el notario tuviera la evidencia *de visu et auditu suis sensibus*, de que el compareciente era la personalidad física y jurídica que se afirmaba, haría falta que como tal notario presenciara el hecho del parto y la identidad permanente del nacido desde el alumbramiento hasta la comparecencia. . . . La calificación del notario se refiere a un problema de notoriedad: que en la vida social y en el tráfico civil una determinada persona física ostenta, de modo público y notorio, un nombre y un *status civilis*. . .'. Esta calificación de carácter técnico se llama 'fe de conocimiento', y supone una inquisición previa hecha a las partes, u otorgantes. Sin ella, 'el tráfico jurídico se vendría abajo' ". Neri, *op. cit.*, pág. 419.

■ Aunque existe discrepancia entre algunos autores —López Garzón, *op. cit.*, pág. 275— el ámbito de la fórmula jurídica desglosa la identidad en tres dimensiones: la física, la civil y la jurídica. La Sec. 16 de la Ley Notarial preceptúa que los notarios "[t]ambién darán fe acerca de la edad, estado, profesión y vecindad de los otorgantes, con relación al dicho de los mismos". Sobre estos tres elementos, Neri expone:

1) La identidad *física*, o sea, el conocimiento por el nombre y apellido, importa el factor esencial, por lo mismo que por ellos los individuos adquieren denominación jurídica, se distinguen entre sí, y hasta comprueban su ser con la partida de nacimiento desde el instante mismo en que advienen al mundo. Se aduce que tales elementos de identificación no son absolutos, por lo mismo que el nombre o el apellido de una

persona, a la vez que pueden ser compartidos por otra, son susceptibles de cambio o alteración, y aun de modificación, por los propios interesados, como ocurre respecto de aquellos que por ignorancia o por satisfacción, y hasta por conveniencias generales, usan o emplean nombres distintos de los que mencionan sus inéditos documentos. Ante tales circunstancias, las medidas que se extremen para cerciorarse de la verdad disiparán toda inquietud derivada de los homónimos, y el funcionario, prueba en mano, podrá actuar resueltamente. *En este sentido es concebible, y hasta natural, que a pesar de lo proverbial del conocimiento de una persona, el funcionario eche mano a las interrogaciones, con toda desnudez, y obtenga de ellas todos los informes necesarios para determinar su pasado y presente jurídico, y con lo así conocible obtenga la prueba y persuasión, como resultantes, precisas para declarar la verdad sobre la identidad del otorgante.* El hecho de la notoriedad del individuo es una fase que cabe especialmente contemporizar, pues bajo su señorío puede ocultarse más de una circunstancia, y hacer que se perciba a la persona distintamente de lo que es; los elementos, en consecuencia, que proporciona la notoriedad son de relativo valor, y, por tanto, dentro de la función pública, no instigan a presumir que el otorgante sea ciertamente él y que el derecho invocado sea realmente suyo. *Se imponen las exigencias y los consiguientes medios de comprobación, porque ante la necesidad de puntualizar estrictamente a los elementos relativos a la personalidad, toda circunvisión será poca: a la notoriedad corresponderá agregar las seguridades de la convicción y certeza. De consiguiente, el funcionario tendrá que estar bien al cabo del nombre, edad, estado, domicilio, nacionalidad y derecho de las personas que postulen los servicios profesionales;*

2) la identidad *civil*, vale decir, el conjunto de elementos que atestiguan el estado civil, entraña un complemento necesario, cuya capital importancia se trasunta al paso de la vida de relación humana. El nombre y apellido no son suficientes; merced a este único signo de identificación hubiera sido fácil urdir sustituciones. Con la institución del estado civil se abrigan menos dudas, puesto que la suplantación de una persona por otra, aun suponiendo que sean concurrentes todos los atributos que caracterizan al individuo, por efecto del homónimo, resultará difícil hacer ocupar por uno el lugar de otro,

precisamente porque los positivos medios de identificación que han sido creados por la técnica del derecho contribuyen de uno u otro modo a dilucidar cualquier titubeo que se tenga en derredor de los atributos de la personalidad. De consiguiente, y no obstante los cambios de atributos que hayan podido operarse, la tarea de identificación será siempre factible, y, sin mayor esfuerzo, podrá realizarse desde el nacimiento hasta la capacidad; a no ser que se trate de personas indocumentadas, o que por arte de superchería se haya documentado falsamente; y

3) la identidad *jurídica,* o lo que es igual, la relación evidente entre el sujeto individualizado y el derecho invocado. Como fácilmente se percibe, aquí la identidad personal depende de tres aspectos concurrentes a un mismo objetivo y armónicos entre sí; tres aspectos que son medio y fin, respectivamente, y que responden a la idea fundamental de la dación de fe del conocimiento del hombre que ejecuta actividades en la vida jurídico-social y, a la vez, del consiguiente derecho que le concierne. (Énfasis nuestro.) *Op. cit.*, págs. 420–422.

En síntesis, universalmente se reconoce que el conocimiento directo y personal del notario es el más idóneo y normalmente usado.(¹)

Ahora bien, careciendo el notario de ese conocimiento, se puede recurrir a los medios supletorios, tales como testigos de conocimiento, si éstos, según reza el texto legal, son "personas *bien conocidas* del notario". ¿Qué significado tiene esa notoriedad? Los comentaristas, en su mayoría, al discutir el problema se inclinan a sostener que no basta el *simple* conocimiento, sino que es menester que el notario conozca adecuada y satisfactoriamente la solvencia moral de los testigos, pues: ¿qué garantía puede prestar la

---

(¹) Ante el Comisionado Especial declaró el Lic. Luis Mojica Sandoz, Registrador de la Propiedad de vasta experiencia, en el sentido de que durante sus años "nunca h[a] visto una escritura donde el notario diga que no conoce el otorgante, pero que se asegura de su conocimiento personal por documentación tendiente a la identificación del otorgante". (T.E., págs. 8–9 en autos.)

fe notarial, si el notario no considera honrados a los testigos que precisamente suplirán su falta de conocimiento?

Y finalmente, en casos graves y extraordinarios, "en que a un notario le sea imposible dar fe del conocimiento de los otorgantes, ni *puedan* éstos presentar un testigo o testigos de conocimiento, *lo expresará así, designando* los documentos que presentaren como *prueba* de su nombre, estado y vecindad". Es unánime el criterio de que los documentos de identidad como medio supletorio —relacionándose en el instrumento— comprenden carnet o documentos de identidad —con fotografías o firmas— expedidos por las autoridades públicas y cuyo objeto sea identificar para fines legítimos a las personas. En el Puerto Rico contemporáneo, la licencia de conducir, la tarjeta de identificación electoral, el pasaporte —documentos que contienen datos sobre las características físicas de la persona (edad, estatura, ojos, otras señas) con una fotografía— constituyen medios preferentes y aceptables que, unidos al prudente trabajo investigativo del notario, previo y coetáneo al otorgamiento, permiten viabilizar la dación de fe notarial bajo un estado de convicción anímica razonable.

*Conclusiones*

De los comentarios y argumentos expuestos se desprende que, no obstante sus dificultades intrínsecas, la fe de conocimiento es el elemento que da vida y razón de ser a la fe pública notarial. Descartarla sería "herir de muerte el instituto notarial". Lassaga, *op. cit.*, pág. 223.

La clave a todo el problema es exigir la fe de conocimiento, ". . .entendiéndola *en sus justos términos*, es decir, *no considerar que se trata de una verdad absoluta* y que al mínimo error del Notario éste debe responder sino que, como posteriormente veremos, estamos ante una verdad relativa ya que de otro modo se descargaría sobre el Notario una obligación que excedería de sus posibilidades pues la identidad objetiva de una persona, como tuvimos ocasión de

ver, es prácticamente imposible fuera de un reducido número de personas allegadas al Notario. Por ello exigir este conocimiento supondría o bien un incumplimiento, por imposibilidad de llevarlo a la práctica, y consiguientemente el vivir los Notarios bajo la contínua infracción legal o bien un verdadero ostracismo profesional que llevaría aparejado un duro golpe a esta Institución. Por otro lado la responsabilidad también debe ser entendida en sus justas proporciones de tal manera que no puede existir responsabilidad por una actuación exenta de la más ligera culpa aunque la fe de conocimiento no se ajuste a la realidad". Ventoso Escribano, *op. cit.*, págs. 361–362.

*Resumen*

Recapitulando. Aunque en la práctica, histórica y contemporáneamente, el descargo y la observancia de la fe de conocimiento conllevan ciertas dificultades reales, lógica y legalmente continúa fundamentada en consideraciones sólidas: evitar la usurpación de la personalidad de otro e imprimirle legitimidad presuntiva al instrumento. Su jerarquía y vigencia actual es incuestionable. La teoría ecléctica favorecida por el notariado latinoamericano descansa en que es un principio consustancial a la función fedataria. Tradicionalmente —y así lo configura nuestra ley— el conocimiento directo y personal del notario es el medio por excelencia para descargar esa función. Esta gestión —pasar por el crisol del juicio notarial— "[n]o puede sujetarse a reglas fijas, ni legales, ni doctrinales, el hecho del conocimiento, cuestión puramente subjetiva que cada notario apreciará con entera libertad, ya que con la garantía de identidad del otorgante asume la consiguiente responsabilidad. . .". Sanahuja y Soler, *op. cit.*, pág. 460; Neri, *op. cit.*, pág. 443.

Careciendo el notario de ese conocimiento directo, de manera supletoria puede acudir a los testigos de conocimiento o en casos apropiados a la prueba documental eficaz. Obsérvese que esos medios son supletorios y conlle-

van una acuciosa, ponderada y completa investigación previa. Los testigos de conocimiento no sólo deben conocer al otorgante, sino ser conocidos por el notario en aquellas cualidades básicas de solvencia moral. Su responsabilidad civil, penal y disciplinaria necesariamente dependerá del grado de diligencia, con relación al cuadro fáctico real ante sí. Dar fe *deliberadamente falsa* del conocimiento de los otorgantes con el propósito de defraudar es la conducta más seria en que pueda incurrir un notario e implica responsabilidad penal. Comete el delito de falsificación. J. A. Bollini, *La responsabilidad del notario por falsa o errónea identidad del otorgante*, 786 Rev. Notarial 1651, 1656 (Septiembre-Octubre 1969).

En caso de dudas fundadas —sea porque el notario carece de los elementos de juicio, o duda de la idoneidad o valor de los medios para obtener el conocimiento— la acción más segura y recomendable es no autorizar el instrumento. Posponerlo para superar esas dudas es lo profesionalmente aconsejable. Ejercidas esas diligencias, si subsiste ánimo ambivalente, debe abstenerse. Ante tal proceder, el notario no está expuesto a incurrir en responsabilidad.

### III

Al aplicar los referidos principios al caso de autos, notamos que el notario querellado Olmo Olmo no cumplió con el imperativo de la Sec. 16 de la Ley, que requiere que se designen expresamente en la escritura los documentos presentados como prueba de identidad y que se consigne el motivo grave o extraordinario que justificó su otorgamiento por los medios supletorios. En este sentido no descargó eficientemente su gestión notarial, aunque se deduce que estuvo ajeno a la trama fraudulenta que planearan los autores —Migdalia Rodríguez, Rojas y el que suplantó a Víctor M. Rodríguez. Fue sorprendido en su buena fe.

Cabe aun así concluir, que del récord no se desprende razón alguna de "caso grave o extraordinario" que justifi-

cara el otorgamiento del Poder ese día, sin ulterior investigación u obtención de datos adicionales corroborativos de la identidad pretendida. En su consecuencia es correcta la determinación del Comisionado de que ". . .no actuó con la acuciosidad que debería exigirse de un notario al tratar con otorgantes desconocidos, [y] su conducta revela, más bien, inadvertencia y un error de juicio. . .".

No obstante, abona a su persona que al momento de otorgar este Poder —11 de septiembre de 1976— no existían los pronunciamientos esbozados en *In re Cancio Sifre,* supra. No estaba debidamente pautado el alcance y perfil de la dación de fe de conocimiento. Toda la evidencia demuestra que el notario Olmo Olmo goza de una excelente reputación personal y profesional notarial incompatible con una conducta fraudulenta. Su historial como notario no acusa incumplimiento en los otros deberes anejos al cargo. No creemos que exista diferencia sustantiva entre su caso y los hechos de *In re Cancio Sifre.* Ambos incurrieron honestamente en el error de no proveerse adecuadamente de los elementos de juicio disponibles para calificar correctamente la identidad de los otorgantes. Allí se dijo: "Quizás el notario [Cancio] al observar la patente diferencia en edad entre el vendedor Nieves Díaz y la hija que presentó como esposa pudo con una pregunta ingenua abortar la trama de que fue víctima". Pág. 394.

En estas circunstancias, sólo cabe como medida disciplinaria justa —en adición a las dimanantes del proceso— nuestra amonestación y prevención contra futuras inobservancias en el ejercicio de su notaría. La hacemos extensiva.a todo el notariado puertorriqueño. Aunque reconocemos la honesta falibilidad humana, hemos de insistir en el fiel cumplimiento de la ley sobre tan importante función.

La dación de fe, esto es, la aseveración de la verdad, es un problema lógico-social de reflexión, de apreciación humana, es una cuestión de sindéresis, vale decir, de discreción, de entendimiento y capacidad natural para discernir los hechos

y juzgar rectamente con acierto, es una cuestión de anímica, a base de aportes intelectuales y sociales en que el convencimiento y la convicción son recíprocamente medio y fin suficientes para determinar el juicio notarial. Por lo que parece, el conocimiento de una persona es cosa fácil; *sin embargo, no es así; como acto derivado de la apreciación humana es falible: puede fallar por error o por engaño, por apreciación directa o indirecta, por influjo o por hechos notorios que revelando la filiación de una persona, hayan creado en uno mismo un estado de conciencia. Cada una de estas circunstancias presenta su característica; por de pronto, el error y el engaño son inherentes al hombre, y se puede incurrir en ellos por sí mismo o inducido por alguien o por influjo de la opinión de otro.* En cuanto a los hechos notorios, fundamentan el conocimiento por la noticia pública que se adquiera de sabido, de fama. A poco que se analice, se ve que no es posible reducir la dación de fe del conocimiento a una regla fija e invariable de interpretación, a algo así como una norma jurídica. El conocimiento, claro está, es norma en cuanto es obligatoria por la razón de que, cumplida por el escribano, con amplio criterio de investigación, consagra la legitimidad del instrumento público; pero por ser esencialmente personal cuadra más bien como regla de obrar jurídico, en cuya actividad el prudente trabajo de investigación, hecho a conciencia, descarta toda posibilidad de error o engaño respecto de la persona indagada. En esto radica, precisamente, la dificultad que ofrece el problema del conocimiento personal. (Escolios omitidos y énfasis suplido.) Neri, *op. cit.*, pág. 443.

Esos escollos deben ser suficiente motivación para que los notarios desplieguen con mayor celo y diligencia el desempeño de tan importante función.

Nada de lo aquí dispuesto prejuzga cualquier responsabilidad civil que por su error haya podido producir a terceros interesados el notario Olmo Olmo.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión.